UNITED STATES of America,

v.

Samuel F. MANARITE et al., Defendants.

No. 69 Cr. 747.

United States District Court,
S. D. New York.

June 30, 1970.

608

Whitney North Seymour, Jr., U. S. Atty., Southern District of New York, New York City, for the United States; Stephen Scott, Special Atty., Dept. of Justice, New York City, of counsel.

James M. La Rossa, New York City, for Richard J. Portela and Carol Ann Portela.

Lipsitz, Green, Fahringer, Roll, Schuller & James, Buffalo, for Paul Wolf and Max Bornstein; Herald Price Fahringer, Buffalo, and Patrick M. Wall, New York City, of counsel.

## OPINION

MacMAHON, District Judge.

Fifteen defendants are charged in a thirteen-count indictment with transporting obscene material in interstate commerce (18 U.S.C. § 1465), with aiding and abetting the transportation of obscene material in interstate commerce (18 U.S.C. § 2), and with conspiring to transport obscene material in interstate commerce (18 U.S.C. § 371).

Four defendants move to suppress evidence allegedly seized in violation of their constitutional rights. An evidentiary hearing was held on April 9, 1970. We will consider first defendants Wolf and Bornstein's motions to suppress.

I. *Wolf and Bornstein's*
*Motions to Suppress*

Defendants Wolf and Bornstein challenge the constitutionality of seizures from defendant James Kelly's book store in Baltimore, Maryland, on June 25, 1969, and from Bornstein's truck and apparently from Richard Portela's car, from Carol Portela's person and from James Kelly's car, in Baltimore, Maryland, on July 12, 1969.

A. *Seizures from Kelly's*
*Book Store*

Baltimore city detectives, on June 25, 1969 acting pursuant to a search warrant, seized from a book store owned by defendant James Kelly, 48 magazines, 16 rolls of film, 67 packages of photographs and 4 decks of playing cards.[1]

Defendants Wolf and Bornstein claim that the warrant authorizing this seizure did not sufficiently particularize the "obscene" material to be seized and that an adversary hearing was not held prior to seizing the material.

The requirement of particularity for a warrant authorizing the seizure of obscene material is a necessary protection for, and a corollary of, the Fourth Amendment's guarantee of freedom from unreasonable search and seizure and the First Amendment's right of free speech. The remedy for violation is suppression of any evidence seized as a result of the violation.[2]

---

1. Transcript of evidentiary hearing held on April 9, 1970 (Tr.), p. 183.

2. United States v. Marti, 421 F.2d 1263 (2d Cir. 1970). See Marcus v. Search Warrants, 367 U.S. 717, 81 S.Ct. 1708, 6 L.Ed.2d 1127 (1961).

■ The requirement of an adversary hearing prior to seizing allegedly obscene material is completely derived from the First Amendment's right of free speech.[3] The remedy for violation of this requirement is not suppression but rather return of the seized material,[4] and defendants' motions to suppress on this ground are, therefore, improper.

The motions, however, are deficient on both First and Fourth Amendment grounds for an even more fundamental reason.

■ The First and Fourth Amendment rights allegedly violated by this seizure are personal rights. Only the actual victim of an invasion of these rights has standing to move to suppress.[5] This simply means that a defendant moving to suppress evidence on either of these two grounds must demonstrate that his own personal right to be free from an unreasonable search and seizure or his own personal right to free speech was violated.

■ Here, the material was seized from a book store owned by James Kelly. There is no evidence, nor is there even an allegation, that defendants Wolf or Bornstein had or have any proprietary interest in the book store or in the items seized.

Since the seizure did not invade defendants' rights of "privacy of person or premises," they lack standing on Fourth Amendment grounds to move to suppress this evidence.[6]

Defendants also lack standing to move to suppress on First Amendment grounds.

■ The general requirement of particularity in warrants is more strictly applied in situations involving the seizure of materials which arguably fall within the First Amendment's protection of free expression.[7] This is necessary to guard against an executing officer's seizing "protected expression," if he is not given some guidelines to direct his exercise of discretion.

[6] Similarly, an adversary hearing is necessary prior to a "massive" seizure of material containing "speech" in order to protect against an interference, albeit temporary, with "protected expression."[8]

But, once again, as in the case of Fourth Amendment rights, only those persons who are victims of governmental interference with the right of free speech have standing to move for suppression.

■ Neither Wolf nor Bornstein were, however, exercising their right of free speech through the seized material. Their right to express themselves was in no sense invaded by this seizure.[9]

---

3. See Astro Cinema Corp. Inc. v. Mackell, 422 F.2d 293 (2d Cir. 1970); Bethview Amusement Corp. v. Cahn, 416 F.2d 410 (2d Cir. 1969).

4. See Astro Cinema Corp. Inc. v. Mackell, supra, 422 F.2d at 296; United States v. Wild, 422 F.2d 34 (2d Cir. 1970).

5. See McGowan v. Maryland, 366 U.S. 420, 429, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961); United States v. Raines, 362 U.S. 17, 22, 80 S.Ct. 519, 4 L.Ed.2d 524 (1960).

6. Wong Sun v. United States, 371 U.S. 471, 492, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). See also Alderman v. United States, 394 U.S. 165, 173, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969); Jones v. United States, 362 U.S. 257, 261, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960).

7. Marcus v. Search Warrants, supra; United States v. Marti, supra.

8. Astro Cinema Corp. Inc. v. Mackell, supra; Bethview Amusement Corp. v. Cahn, supra.

9. This is not a case that falls into the exception that allows a party to raise the constitutional rights of a third party who has no effective way of presenting those rights to the court. See National Ass'n for the Advancement of Colored People v. Alabama ex rel. Patterson, 357 U.S. 449, 459–460, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958); Barrows v. Jackson, 346 U.S. 249, 257, 73 S.Ct. 1031, 97 L.Ed. 1586 (1953); C. Wright, Federal Courts § 13, at 39 (1963).

Wolf and Bornstein's motion to suppress the evidence seized at Kelly's book store on June 25, 1969 is, therefore, denied.

### B. *The Arrests and Seizures on July 12, 1969*

Wolf and Bornstein also move to suppress evidence seized on July 12, 1969 from Bornstein's truck, from Richard Portela's car, from Carol Ann Portela's person and from James Kelly's car.

Defendants Wolf and Bornstein claim that the arrests on July 12, 1969 were invalid because the officers lacked probable cause. They also claim that the arrests and subsequent searches violated the Fourth Amendment because the law enforcement officials had probable cause prior to the arrests and had sufficient time to obtain warrants but failed to do so. Finally, they claim that the seizures were without a warrant and a prior adversary hearing and were, therefore, unconstitutional.

██ Wolf fails to demonstrate that he has standing to challenge any of the arrests made on July 12, 1969 or to move to suppress any of the evidence seized at that time.[10] Bornstein has standing only to challenge the validity of his own arrest and to move to suppress the evidence seized from his truck.[11] Nevertheless, since the validity of all the arrests and seizures on July 12, 1969 depend on the application of the same legal principles to the same fact situation, we will determine whether any of the defendants' constitutional rights were violated by the arrests and seizures on July 12, 1969.

James Kelly, after the seizure at his book store, decided to cooperate with the Baltimore city police. He was directed by Lieutenant George R. Andrew of the Baltimore police to Agent Robert Noel of the Federal Bureau of Investigation.[12]

Kelly, on July 8 and 9, 1969, told Noel that he had purchased all the material seized from his book store from a Richie Portela.[13] Kelly called Noel at 2.00 A.M. on July 12, 1969 and said that Richard Portela had just been in his store and told him he was registered with his wife and children at the Holiday Inn under the assumed name of "Devito." Richie also told Kelly that he had the reels of film that Kelly wanted but "that things were hot in New York and that he had to have a kid drive the material down to Baltimore by truck." Kelly arranged to meet Portela at the Holiday Inn at 11:00 A.M. on that same morning of July 12 and agreed to purchase 240 reels of film.[14]

██ The story Kelly told Noel was, if reliable, more than sufficient to constitute probable cause to arrest. Kelly's reliability was not, however, conclusively established until only minutes before the actual arrest. Prior to that, Noel had only been able to corroborate some peripheral particulars of Kelly's story and the one solid incriminating fact, that Portela was registered at the Holiday Inn under the assumed name of "Devito," the same name Kelly had given Noel.[15] Noel also found out that Portela, upon checking in at the Holiday Inn, sought out another man registered under the name of "Max Miller," later identified as defendant Max Bornstein. Noel located in the parking lot a Ford truck bearing the license plates listed on Bornstein's motel registration card. Noel noticed inside the truck several 12″ x 15″ tan corrugated cardboard boxes, similar in size, shape, material and color to boxes which on previous occasions the Agent had found to contain 100 reels of obscene film.[16]

Nevertheless, Kelly's reliability did not become demonstrable until the law enforcement officials, themselves, observed the sale at the approximate time,

---

10. See notes 5 and 6, *supra*, and accompanying text.

11. *Id.*

12. Tr. 193–194, 243.

13. Tr. 193–194, 196–198.

14. Tr. 198.

15. Tr. 198–200.

16. Tr. 199–200.

at the same place and involving the same people as previously described by Kelly.

The officers' observations of the transfer of cardboard boxes by Bornstein and Portela from Bornstein's truck to Portela's car, Portela's handling Bornstein some money and finally the transfer of these same boxes by Portela and Kelly from Portela's car to the trunk of Kelly's car [17] not only corroborated Kelly's statements to Noel, but in combination with Kelly's statement immediately prior to the arrest that the boxes contained film purchased from Portela, were more than sufficient to establish probable cause for the arrest.[18]

The arrest of Bornstein and the other defendants was therefore valid.

We turn to defendants' claim of delay in attempting to obtain a warrant.

■ The failure to obtain a warrant was reasonable in light of the fact that Noel did not learn of the prospective sale until 2:00 A.M. on a Saturday morning, only nine hours prior to its taking place. He had absolutely no facts which would justify to himself, or demonstrate to an impartial magistrate, Kelly's reliability. At this point, Noel certainly did not have probable cause to arrest.[19]

Noel spent the next few hours attempting to corroborate Kelly's story, but still the facts possessed by the officers prior to the on-the-scene observations were not sufficient to constitute probable cause. Their failure to attempt to obtain a search warrant did not, therefore, prejudice defendants.

Even if we were to assume that the officers had probable cause to arrest by the early morning hours of July 12, 1969, there are still no facts evidencing "deliberate or unreasonable delay."[20]

It was quite reasonable for the officers to be somewhat doubtful as to the legal effect of the facts they possessed and to want the opinion of a lawyer. The fact that it was a Saturday morning, that there was no clerical staff available to type the proper affidavits and the warrant itself, and that the nearest judge was a one and one-half hour round-trip away [21] are circumstances which demonstrate that the failure to obtain the warrant was not due to deliberate and unreasonable delay, but necessitated by the pressure of a deadline imposed by the defendants' arrangements and not by the officers' conduct.

■ Moreover, the validity of warrantless searches "turns upon reasonableness under the circumstances and not upon the practicality of procuring a search warrant since such warrant is not required." [22]

We turn, therefore, to determine the reasonableness of the searches and consequent seizures.

■ The search of Mrs. Portela's pocketbook is certainly justifiable as a limited search for concealed weapons.[23]

■ The remaining searches of Kelly's car, Portela's car and Bornstein's truck are reasonable under established Fourth Amendment principles.

Kelly's total cooperation with the police and F.B.I., his statement to Lieutenant Andrew immediately prior to his arrest that the films in his trunk were purchased from Portela, and his failure to move to suppress this evidence demonstrate his consent to the seizure.[24]

17. Tr. 207–212, 249–253.

18. See Draper v. United States, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959); Smith v. United States, 123 U.S.App. D.C. 202, 358 F.2d 833 (1966), cert. denied, 386 U.S. 1008, 87 S.Ct. 1350, 18 L.Ed.2d 448 (1967).

19. See Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969); Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964).

20. Niro v. United States, 388 F.2d 535 (1st Cir. 1968).

21. Tr. 204–205, 245–247.

22. United States v. Mazzochi, 424 F.2d 49 (2d Cir., 1970).

23. See Terry v. Ohio, 392 U.S. 1, 29, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

24. Tr. 253.

The defendants do not dispute that both Portela and Bornstein, upon learning that Lieutenant Andrew intended to obtain a warrant, also consented to the search of the car and truck. Their consent is unequivocally and conclusively established by the uncontradicted evidence that Portela and Bornstein gave Andrew the keys to the car and truck.[25]

 The fact that Andrew would have searched the cars and truck pursuant to a warrant, regardless of whether the defendants consented, does not, by any possible logical extension, render the defendants' consent involuntary.

Wolf and Bornstein finally move to suppress the evidence seized on July 12, 1969 because no adversary hearing was held prior to the seizure.

As we pointed out before, an adversary hearing prior to the seizure of a "massive" quantity of obscene material is required to guard against a seizure of "expression" protected by the First Amendment.[26] The evil is the substantiality of the interference with the First Amendment right to free expression and the reciprocal right to receive information. The corresponding remedy is, therefore, return of the material and not suppression of the material as evidence in a criminal trial.[27]

Defendants Wolf and Bornstein do not move for a return of the material, and we, therefore, need not decide whether the seizures were so "massive" as to require a prior adversary hearing.[28] Their motion to suppress on this ground is denied.

None of the searches and seizures involved in the arrests on July 12, 1969 in Baltimore, Maryland, violated the moving defendants' constitutional rights, and their motions to suppress the evidence obtained as a result of these searches are, therefore, denied.

We turn now to the Portelas' motion to suppress.

## II. The Portelas' Motion to Suppress

Richard and Carol Ann Portela's challenge to the searches and seizures at their apartment is solely on the ground that the searches and consequent seizures were beyond the scope of a search incident to a lawful arrest, as recently defined by the United States Supreme Court in Chimel v. California.[29] They do not challenge the validity of the arrest warrant or of the arrest itself. Nor do they claim that the seizures constituted a "massive" seizure of "obscene" material requiring a prior adversary hearing.

The Supreme Court in Chimel strictly limited the scope of searches incident to lawful arrests. Such searches are limited to "a search of the arrestee's person and the area 'within his immediate control'—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence."[30]

 The Chimel standard is applicable to searches that occur after June 23, 1969.[31] The searches and seizures that occurred at the Portela apartment took place on July 23, 1969, and thus

---

25. Tr. 256–257. See Amos v. United States, 255 U.S. 313, 41 S.Ct. 266, 65 L.Ed. 654 (1921); United States v. Sclafani, 265 F.2d 408 (2d Cir.), cert. denied, 360 U.S. 918, 79 S.Ct. 1436, 3 L. Ed.2d 1534 (1959).

26. See Astro Cinema Corp. Inc. v. Mackell, supra; Bethview Amusement Corp. v. Cahn, supra.

27. See Astro Cinema Corp. Inc. v. Mackell, supra, 422 F.2d at 296; United States v. Wild, supra.

28. See Astro Cinema Corp. Inc. v. Mackell, supra.

29. 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed. 2d 685 (1969).

30. 395 U.S. at 763, 89 S.Ct. at 2040.

31. United States v. Bennett, 415 F.2d 1113 (2d Cir. 1969).

their validity is determined by applying *Chimel.*

▮▮▮▮ All of the challenged searches involved seizures of evidence that actually were within an area from which either Richard Portela or Carol Ann Portela might gain possession of a weapon or destructible evidence.

Two address books, a paper bag containing reels of film, a bag containing 43 color photographs and a bag containing 165 slugs the size of a quarter were all seized at a time when Richard Portela was standing at the portable bar near the entrance to his living room. Portela was in the custody of one agent and later a second agent, but during this time he was not handcuffed or in any way physically restrained.

The two address books were lying on the surface of the bar within easy reach of Richard Portela, and the bag containing the reels of film was lying on the floor about two feet from him. The agent next to Portela could see that reels of film were in the bag, and when asked what was in the bag Portela replied "that is hard core stuff." [32]

The tear gas gun, the bag containing 43 color photographs and the bag containing 165 slugs were found on the first shelf of the inner portion of the bar. At the time they were seized, Portela was standing merely six inches from the surface of the bar and could have easily reached over the bar and grabbed any of these items. [33]

▮▮▮▮ A box labelled "cartridges" and containing .32 caliber ammunition and a box containing a gun were found in the bedroom closet. At the time, Mrs. Portela had gone into the bedroom with an agent and a nurse employed by the F.B.I. in order to get a dress out of the closet. The agent informed Mrs. Portela that he would have to get the dress for her. She made no protest. Upon opening the closet door, he saw on the first shelf a box labelled "cartridges" and

found that it contained .32 caliber ammunition. He then noticed a box lying on the floor of the closet, which he opened. The box contained a gun. The agent seized both the gun and the ammunition. [34]

Later on, when the agents were about to leave with the Portelas, John Monaghan, the agent in charge, asked Mrs Portela if she wanted a raincoat and she said she did. The agent then asked her where it was located and she told him in the closet.

Monaghan went over to the nearest closet located in the hallway entrance and upon opening the door noticed on the closet shelf a looseleaf folder bearing the initials "CVS." The initials were significant to Monaghan because a certain Louis Saks, who had a long history of arrests for various pornography offenses, owned "CVS" Color Sales. [35] Also in open view on the shelf was a brown manila envelope containing negatives of females in various acts of "sadism and masochism." [36]

Monaghan seized both the looseleaf book and the negatives.

Although the closets were not clearly areas from which Mrs. Portela could have reached for a weapon or evidence, they would certainly have become such areas if the agents had allowed her to open the closets herself. In fact, had they allowed her to open the closets herself, they would have been perfectly justified in thoroughly searching the closets before she actually reached in for her dress or raincoat.

Thus, in order to protect themselves, the nurse and the other law enforcement officials from the serious danger of Mrs. Portela seizing a weapon from the closets, it was necessary and reasonable for the agents to open the closet doors and take out a dress and raincoat for Mrs. Portela. In doing so, the various items seized were lying in plain view, and their seizure was justified under es-

---

32. Tr. 127–129, 154–155.

33. Tr. 154, 161, 166.

34. Tr. 87.

35. Tr. 27–29.

36. Tr. 29.

tablished Fourth Amendment principles.[37]

The agents also seized several reels of film, some copies of Color Climax magazine, comic books, Western Union money order receipts and several notebooks from two end tables in the living room.

Agent Monaghan, when he stepped through the entrance hallway, noticed two men lying on two couches near the far left wall of the living room in front of the terrace entrance. One couch was against the wall and there were tables at both ends of this couch. The other couch was a few feet away and faced the couch against the wall. On top of one of the end tables (marked as "End Table No. 1") in plain view was a copy of the magazine "Color Climax." [38]

Agent Monaghan, after placing Richard Portela and Carol Ann Portela in the custody of other agents, walked over to the two couches and told both men to remain in their prone positions. The men were both wearing T-shirts and had apparently been sleeping on the couches in the Portela apartment. Neither Agent Monaghan nor any of the other law enforcement officials was able to identify the two men.

Monaghan directed the men to stand. They stood midway between the two couches, one standing about two feet from End Table No. 1 and the other about three feet from End Table No. 2. The men were facing Richard Portela, who was standing across the room from them, about six to twelve feet from the two end tables.[39]

At the time Monaghan searched End Table No. 1 and ordered the search of End Table No. 2, he had already been informed that a gun and a box of cartridges had been found on the premises.[40] The two as yet unidentified men were standing two to three feet from the two end tables. They were not handcuffed or restrained in any way, and no one was positioned between them and the end tables.

Both men had apparently been sleeping in the Portela apartment and were likely relatives or intimate friends of the Portelas. Since they were both in full view of Portela, who had already been placed under arrest, it would be reasonable for the agents to assume that if Portela had signalled the two unidentified men, they would have been able to reach over and draw a weapon out of the end tables.

Monaghan also observed that the end tables opened from the top, making it a lot easier for one of the men to reach in from the top and quickly draw out a weapon.

In short, it was entirely reasonable and absolutely necessary for the safety of the law enforcement officials to consider the two men as Portela's possible agents or accomplices, in effect as extensions of Portela's physical presence, constructively placing Portela within reach of the two end tables. Moreover, since a gun and ammunition had already been found in the apartment, it was not unlikely that other weapons would be secreted throughout the apartment. The discovery of the tear gas gun behind the bar demonstrates the reasonableness of this assumption.

The searches of, and seizures from, the end tables which were within the reach of the two unidentified men and therefore could be reasonably considered to be in the constructive reach of the arrested person, were properly incident to the lawful arrest as defined in *Chimel*.[41]

The agents' activities in the Portela apartment evidenced a scrupulous regard for the letter and spirit of the *Chimel* rule. The only searches were of areas

---

37. See Chimel v. California, 395 U.S. 752, 763, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969) ; Harris v. United States, 390 U.S. 234, 236, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968) (holding seizure of evidence in "plain view" reasonable under Fourth Amendment).

38. Tr. 23.

39. Tr. 90–91, 138, 157.

40. Tr. 88–89.

41. Chimel v. California, *supra*, 395 U.S. at 763, 89 S.Ct. 2034.

which could reasonably be considered to be areas from which the arrested persons or their extensions, the two unidentified men, could quickly reach for a weapon or destructible evidence.[42]

There was no search of any room which was not occupied by the Portelas. The agents did not search the kitchen or the second bedroom. In fact, they did not conduct a search of any area of the living room or the first bedroom which was not proximate to either the two Portelas or the unidentified men. This was a rigidly limited search. They did not tear the house apart in a general search for anything they could find.

They made a quick search of the bathroom before Mrs. Portela went in to change and a search of one of the living room chairs before Mr. Portela sat down, and neither of these searches resulted in seizures. Quite obviously these searches, as well as the others discussed above, evidenced a conscientious regard for Fourth Amendment principles.

The Portelas' motion to suppress the evidence seized in their apartment at the time of their arrests on July 23, 1969 is, in all respects, denied.

Accordingly, defendants Wolf and Bornstein's motions to suppress and the Portelas' motion to suppress are, in all respects, denied.

So ordered.

42. Chimel v. California, *supra*, 395 U.S. at 763–764, 766, 89 S.Ct. 2034.