**UNITED STATES of America**

v.

**Daniel C. MASON, Appellant.**

**No. 74–1813.**

United States Court of Appeals, District of Columbia Circuit.

Argued March 11, 1975.

Decided Nov. 21, 1975.

Peter R. Kolker, Washington, D. C. (appointed by this court), for appellant.

Hamilton P. Fox, III, Asst. U. S. Atty., with whom Earl J. Silbert, U. S. Atty., John A. Terry, James F. McMullin and John H. Bayly, Jr., Asst. U. S. Attys., were on the brief for appellee.

Before BAZELON, Chief Judge, MacKINNON, Circuit Judge, and CHRISTENSEN,* United States Senior District Judge for the District of Utah.

Opinion for the court filed by Circuit Judge MacKINNON.

Opinion filed by Chief Judge BAZELON, concurring in part and dissenting in part.

MacKINNON, Circuit Judge:

Following his convictions for unauthorized use of a motor vehicle in violation of D.C. Code § 22–2204 and for two federal firearms violations,[1] appellant Mason now contends that the trial court committed reversible error when it (1) refused to suppress certain evidence, (2) refused to turn over to defense counsel a portion of an FBI agent's report, and (3) refused to sever for trial the vehicle charge from the firearms offenses. We affirm.

## I

*The Facts Concerning the Arrest and Seizure of the Firearm and the Car Keys*

Under our view of this case, it is only necessary to set forth the facts concerning the arrest of Mason and the seizure of the sawed-off shotgun and the car keys.

As of March 4, 1974, Special Agent James K. Murphy of the Federal Bureau of Investigation had been looking for Mason for some time to arrest him on warrants issued by federal courts in Florida and Virginia, charging bail bond violation and car theft respectively. Murphy had previously learned that Mason sometimes stayed at 800 Southern Ave. S.E., Washington, D. C., in an apartment rented by Miss Alfreida P. Williams, his girlfriend. At about 1:30 or 2:00 p. m. on March 4th, the building superintendent of the apartment house telephoned Murphy's office and reported that Mason was in Miss Williams' apartment. The message was relayed to Murphy, and he radioed for assistance from other FBI agents. Upon their arrival at the apartment building, Murphy noticed a Lincoln Continental and a Volkswagen, which he knew Mason had been driving. He was also aware that the Lincoln was a stolen vehicle (Tr. 24).[2] Murphy then obtained a key to Miss Williams' apartment from the building manager and

---

* Sitting by designation pursuant to 28 U.S.C. § 294(d).

1. 26 U.S.C. § 5861(a), possession of an unregistered firearm; and 26 U.S.C. § 5861(i), possession of a firearm not identified by a serial number.

2. "Mo. Tr." refers to the transcript of the hearing on appellant's motion to suppress, held June 18, 1974. "Tr." refers to the transcript of the trial which commenced the following day.

stationed agents at various exits to prevent Mason's escape.

Murphy next knocked at the door of Miss Williams' apartment, identified himself and stated his purpose but received no response. He then attempted to enter the apartment using the key, but the door was secured by a chain lock. He again identified himself. Still receiving no response, he and Special Agent Bailey broke into the apartment. As they entered, they saw Mason coming out of the rear bedroom, arrested him, handcuffed his hands behind his back (Mo. Tr. 47) and advised. him of his rights. As previously noted, the agents were executing the federal bench warrants from Florida and Virginia (Tr. 41), but no search warrant for the apartment had been obtained.

At the time of his arrest, Mason was not wearing his shoes. When he asked to be allowed to put them on, the agents took him back into the rear bedroom and seated him on the bed and Agent Bailey put the shoes on his feet without removing the handcuffs. (Mo. Tr. 48–49). Mason then complained that the handcuffs were too tight and asked that he be allowed to use the bathroom. Agent Murphy accompanied him to the bathroom, removed the handcuffs and allowed him to use the facilities. When he finished, Murphy replaced the handcuffs, this time with his hands in front of his body. (Mo. Tr. 49–50).

Mason then stated that he wanted to put on his leather jacket which he said was in the bedroom closet. To comply with this request, the agents returned him to the bedroom, and Murphy opened the closet door. The closet contained around 30 to 40 hangers of men's clothing and a partially-open white suitcase located on a shelf above the rod (Mo. Tr. 53).[3] At this point, according to Murphy's testimony:

> When I went to the closet the doors were partially open and I pulled them open a little more and I said which one, and he pointed to it and said, I'll get it, and started to step over. At that time Agent Bailey attempted to stop him and I intended to let him come over and get the jacket and I advised him I was going to take the handcuffs off. The only portion of the closet which I could not see into was a white suitcase, and it was partially open.

(Mo. Tr. 51–52).[4] Something was jammed towards the back of the suitcase, causing it to stay open. (Mo. Tr. 56). When Murphy saw the suitcase, he decided to move it out of the way so Mason could not get his hands on it when he selected the jacket. In the attempt to move it, Murphy placed his fingers inside the open lid and felt a metal object which he recognized as the barrel of a firearm. He then pulled the suitcase out of the closet and found it contained a sawed-off shotgun which was broken down into three parts and wrapped in a sweater.

> At the Grand Jury, Agent Murphy testified as follows:
> We advised him we would remove the handcuffs and allow him to put his shoes on and also to pick out a coat and put it on. I had in the past from reviewing his record been knowledgeable of the fact that he had been arrested on occasion in possession of handguns and for my own personal safety which is standard procedure I searched the immediate area where he would have to be and for the protection of the other agent. I looked in the closet where the coat was supposed to be hanging and on a shelf slightly lower than eyelevel for myself I observed a white suitcase.
> (Mo. Tr. 52–53).

---

3. The testimony as to the exact location of the suitcase in the closet varied slightly, but there was substantial agreement that it was within reach of a person standing in front of the closet. (Mo. Tr. at 51–55).

4. Agent Bailey testified:

Well, I was watching Mason most of the time but when we came back into the bedroom he indicated that he wanted a jacket and started to move towards the closet and I said, 'hold it right there,' and Agent Murphy said, 'I'll get it for you.' And I stood there holding Mason and he opened the closet and next thing I saw was a suitcase come out with the contents in it.
(Mo. Tr. 67).

Following the discovery of the sawed-off shotgun, Mason was handed his jacket and allowed to put it on (Mo. Tr. 64). Agent Bailey then took him out of the bedroom and seated him at the dining room table. In doing so, Bailey noticed some car keys lying in plain view on the table, one of which bore an emblem of a Lincoln Continental. He recalled that Agent Murphy had stated that Mason was driving a silver Continental which Murphy had pointed out to Bailey in the parking lot before they entered the building. Bailey thus picked up the keys, showed them to Murphy, and asked him if he wanted to keep them. Murphy said he did and Bailey then gave Murphy the keys (Tr. 80).

## II

*The Motion to Suppress*

Prior to trial, appellant made a timely motion to suppress two items of evidence seized in the apartment when he was arrested—the sawed-off shotgun, which formed the basis for the federal firearms charges, and the keys to the stolen Lincoln Continental, which was the automobile involved in the local motor vehicle offense. It is appellant's principal contention that the seizure of these two items violated the principles announced by the Supreme Court in *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). The Government replies that the seizure of the firearm was the result of a valid search incident to the execution of an arrest warrant and that the car keys were validly seized under the plain view doctrine. Ancillary to appellant's motion to suppress this evidence is his claim that the seizure of the firearm and the car keys was unreasonable under the Fourth Amendment because the circumstances required the agents to obtain a search warrant before seizing said evidentiary items.

In *Chimel,* Justice Stewart reviewed the prior decisions of the Supreme Court relating to searches and seizures under the Fourth Amendment and announced the principles that must govern this case:

When an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape. Otherwise, the officer's safety might well be endangered, and the arrest itself frustrated. In addition, it is entirely reasonable for the arresting officer to search for and seize any *evidence* on the arrestee's person in order to prevent its concealment or destruction. *And the area into which an arrestee might reach in order to grab a weapon or evidentiary items must, of course, be governed by a like rule. A gun on a table or in a drawer in front of one who is arrested can be as dangerous to the arresting officer as one concealed in the clothing of the person arrested.* There is ample justification, therefore, for a search of the arrestee's person and *the area "within his immediate control"— construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence.*

There is no comparable justification, however, for routinely searching any room other than that in which an arrest occurs—or, for that matter, for searching through all the desk drawers or other closed or concealed areas in that room itself. Such searches, in the absence of well-recognized exceptions, may be made only under the authority of a search warrant. The "adherence to judicial processes" mandated by the Fourth Amendment requires no less. 395 U.S. at 762–763, 89 S.Ct. at 2040. (emphasis added). The opinion in *Chimel* also quoted from *United States v. Rabinowitz,* 339 U.S. 56, 66, 70 S.Ct. 430, 434, 94 L.Ed. 653 (1950) that "the reasonableness of searches . . . [depend upon] the total atmosphere of the case."

■ When we apply these principles to the discovery and seizure of the sawed-off shotgun, we must conclude that the seizure was lawful. When appellant requested his leather jacket from the closet and stepped forward to a point

within three or four feet of the closet before he was stopped, he brought within his immediate control the area where the gun was concealed in the suitcase. This conclusion is based on our examination of the testimony, the photographs of the closet, and the markings placed on the diagram of the closet by the witnesses (Mo. Tr. 53, 56, 57; Defendant's Exhibits 1, 2 and 3).[5] That he was handcuffed necessarily restricted the area within his reach but did not reduce it sufficiently so as to exclude the closet. Since his arms were handcuffed in front of him, it would have been very easy for him to reach the suitcase within three or four feet of where he was standing (Tr. 53, 56, 57). The agent would have been derelict in his duty to protect the other agent and himself if he had not taken the necessary precaution to examine the suitcase, which was partially open and which apparently was the only thing in the closet other than the numerous hangers of clothing. The suitcase was a natural place to hide a firearm and could just as easily have contained a loaded revolver as the broken down sawed-off shotgun. The fact that the suitcase was jammed open by some object would justifiably arouse the suspicions of any agent alert to his responsibilities. Also, Agent Murphy's stated intention to release the handcuffs, either to permit Mason to select his jacket or to put it on, made it imperative that he check the closet first. Thus, the total atmosphere of the case indicates that it was completely reasonable for Agent Murphy to examine the suitcase exactly as he did.[6]

Of course, *Chimel* does not permit the arresting officers to lead the accused from place to place and use his presence in each location to justify a "search incident to the arrest." However, the instant case presents an entirely different situation. Here it was Mason who led the officers to the closet. Where a person in custody asks to be given access to an area, he has no basis to object that the arresting officers conducted a protective search to secure the area prior to granting his request. The agents undoubtedly could have taken measures which would have rendered a search of the closet unnecessary (*e. g.*, draw their weapons, remove Mason to the far side of the room and have him describe the jacket, take him out to the street before allowing him to put it on, etc.), but the existence of alternative approaches does not imply that what actually occurred was unreasonable. Since we conclude that the agents acted reasonably under the circumstances, we affirm the District Court's denial of appellant's motion to suppress the shotgun.[7]

We must also hold that the keys to the stolen car were properly seized and introduced into evidence. First, since they were admitted into evidence without objection (Tr. 126), any objection on appeal has been waived. Secondly, the keys were in plain view of officers who were legally in the apartment in the course of executing two valid arrest warrants at the time they found the keys and thus were properly seized under the "plain view" doctrine. *Coolidge v. New Hampshire,* 403 U.S. 443, 464–473, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); *Marron v. U. S.,* 275 U.S. 192, 48 S.Ct. 74, 72 L.Ed. 231 (1927) (seizure of incriminating ledger discovered

---

5. *See* note 3, *supra.*

6. The agent asserted that he did not intend to conduct a search of the suitcase or the closet but only wished to move it out of appellant's reach (Tr. 58–59), and thus his discovery of the shotgun was inadvertent. This would form an additional basis for holding that the seizure of the shotgun was reasonable. However, since we conclude that the agent was justified under the circumstances in conducting a search of the suitcase, we have no occasion to consider whether his discovery of the shotgun was intentional or inadvertent.

7. *See also United States v. Williams,* 147 U.S. App.D.C. 173, 174, 454 F.2d 1016, 1017 (1972); *United States v. Manarite,* 314 F.Supp. 607 (S.D.N.Y.1970), *aff'd,* 448 F.2d 583, 593 (2d Cir.), *cert. denied,* 404 U.S. 947, 92 S.Ct. 281, 30 L.Ed.2d 264 (1971); *United States v. Frazier,* 304 F.Supp. 467 (D.Md.1969), *aff'd sub nom. United States v. Webster,* 426 F.2d 289 (4th Cir. 1970), *cert. denied,* 402 U.S. 986, 91 S.Ct. 1676, 29 L.Ed.2d 152 (1971).

during valid search for items specified in the search warrant). The limits and rationale of the plain view doctrine are clearly set forth in *Coolidge* at 403 U.S. at 465–473, 91 S.Ct. 2022.[8]

The contention that a search warrant should have been obtained is wide of the mark. This is not a case where a search warrant *could* have been obtained because the agents did not have sufficient advance knowledge to prepare the affidavit "particularly describing . . . the . . . things to be seized"[9] which is required for the issuance of a search warrant. Prior to their inadvertent discovery, the agents had no knowledge that the sawed-off shotgun or the car keys were in the apartment. They merely stumbled on these items in the normal course of arresting Mason and getting him dressed, as he requested, so he could go outside.

In summary, the agents were where they had a lawful right to be, they had no prior knowledge of the evidentiary items in question, and they did not seize any article outside the area that was within the immediate control of the accused at the time of the seizure or within plain view from locations where their lawful activities had taken them. It also bears repeating that no general search was indulged in even after the discovery of the sawed-off shotgun. We therefore conclude that the motions to suppress the firearm and the car keys were properly denied because under all the circumstances the agents acted reasonably in their discovery and seizure of the firearm and keys.[10]

---

8. See *James v. United States,* 135 U.S.App. D.C. 314, 418 F.2d 1150 (1969); *Dorsey v. United States,* 125 U.S.App.D.C. 355, 372 F.2d 928 (1967).

And see our discussion of the relationship between the plain view doctrine and *Chimel* in *United States v. Thweatt,* 140 U.S.App.D.C. 120, 122–25, 433 F.2d 1226, 1228–31 (1970).

9. U.S.Const., Art. IV.

10. A few statements in the dissent deserve comment.

First, the dissent takes an unrealistic approach when it refuses to recognize that whatever the purpose might be for releasing Mason from his handcuffs in connection with his jacket, a sawed-off shotgun (not rifle) (Tr. 29) within arms length of the arrestee (Mo. Tr. 51, 53, 57, 64) could have endangered the agents. A sawed-off shotgun can easily be handled by a handcuffed person. Similarly, the dissent too quickly discredits the agents' assertion that they actually intended to unhandcuff Mason (so that he could select a jacket) when in fact the agents had previously removed the handcuffs (Mo. Tr. 49, 50, 66), had again told Mason they were going to remove the handcuffs so he could put on his jacket (Mo. Tr. 51), and then had proceeded to do precisely that once they found the shotgun and moved it out of Mason's reach (Mo. Tr. 68).

The dissent also states: "Most important, there was no need whatsoever to unhandcuff Mason. He had already described in detail the jacket he wanted." This ignores the fact that the agents were reacting to a request by Mason to *put on* the jacket (Mo. Tr. 50), and that it could not be put on him while he was handcuffed. The dissent goes on to argue that "we cannot know whether [the trial judge] found that the agents were planning to unhandcuff Mason." It is submitted that no contrary finding is permissible since on this record it is uncontradicted (Mo. Tr. 50) that the agents so stated, because this was the only way the jacket could be put on, and because the agents' acts did conform to their previously stated intention. Moreover, the testimony on this point was not disputed even by Mason himself when he took the stand (Mo. Tr. 75–86).

Yet another flaw in the logic of the dissent appears when it concludes that Agent Murphy "disavowed any intent to 'examine the suitcase'; he sought only to push it away." Although Murphy did *initially* have that intent (Mo. Tr. 58), he testified that subsequently, when he put his "hand in [the suitcase] to move it down" (Mo. Tr. 57) and "felt the steel [gun barrel]" (Mo. Tr. 59), "for my own personal safety which is standard procedure I searched the immediate area where he would have to be and for the protection of the other agent" (Mo. Tr. 52).

Finally, the dissent argues that the agents had no justification or need for allowing Mason access to the closet; they could, it implies, have done things differently. In this fact situation, however, it would have been impossible to comply with Mason's request that he be allowed to "put on" his jacket and not to release his hands from the handcuffs. Of prime importance is the fact that all these actions were prompted by the arrestee's undenied requests. If the agents had misquoted him, he would have contradicted them when he took

## III

*The Motion in Reliance on the Jencks Act (18 U.S.C. § 3500) to Produce the Entire Report to the FBI Prepared by Special Agent Murphy*

After Agent Murphy testified, appellant's counsel requested that his entire report to the FBI, dated March 16, 1974, be turned over to the defense for examination. Specifically, the request was for "anything this agent wrote in connection with this case." (Tr. 49)[11] The prosecutor did not object to turning over any parts of the report which were relevant to the agent's testimony at trial, but he did object to turning over the entire 23 page report. The court concluded:

> I don't think the Jencks Act means that an agent has to disclose everything he did in a case, the investigation. I think you are entitled to a statement or [sic] if it touches on the subject of his testimony in chief, direct testimony from the stand.

Tr. 49. The court then examined the entire report *in camera* and ordered the Government to turn over pages 4 through 12. The remainder of the report, according to the judge, contained, *inter alia,* a report from a Virginia police officer that was irrelevant to the instant offenses, a list of Mason's aliases, and his police record. The entire report was then placed under seal and made a part of the record for appellate purposes.

The Jencks Act requires the United States, following the testimony of a witness, to produce any statement[12] of the witness in its possession "which relates to the subject matter as to which the witness has testified." 18 U.S.C. § 3500(b). Where the statement contains matter which does not relate to the subject matter of the witness' testimony, the statute provides that the court shall examine the entire statement, excise any irrelevant portion, deliver the relevant part to counsel, and if counsel objects, seal the entire statement for appellate review. *Id.* § 3500(c).[13] The court fol-

---

the stand. Moreover, it is to be noted that the agents did not use these requests as an excuse to undertake a general search of the apartment, the bedroom, or even of the closet; instead, their acts were limited to those necessary to protect themselves. There are other similar incorrect factual assumptions and unpersuasive speculations and conclusions in the dissent, a discussion of which would unnecessarily extend this opinion.

In general the dissent fails to take cognizance of normal human conduct and would require findings for what is obvious from the testimony as to statements and actions of individuals. It was not necessary for the court to find some subjective reason for permitting Mason to put on the jacket next to the closet— the facts are Mason was standing there, he asked the agent to be allowed to put on his jacket, it was March 4th and the time of year when jackets are worn outside in the District of Columbia where Mason was soon to emerge, and the agent was willing to accede to Mason's request so as to allow him the comfort of wearing a jacket. Motivations which are obvious from the testimony need not be reduced to formal findings of fact.

11. Appellant subsequently asked for anything that was "material" (Tr. 49), "which relates to any statements made by my client" (Tr. 50), "which relates to the manner which the arrest

was carried out" (Tr. 50), "that in any way relates to what the agents did in the apartment, what they did with Mr. Mason after they arrested him" (Tr. 52), and "that describes statements taken from other witnesses who will testify" (Tr. 52).

12.    (e) The term "statement", as used in subsections (b), (c), and (d) of this section in relation to any witness called by the United States, means—

(1) a written statement made by said witness and signed or otherwise adopted or approved by him;  .   .   .
18 U.S.C. § 3500(e).

13.  18 U.S.C. § 3500(c) provides:

(c) If the United States claims that any statement ordered to be produced under this section contains matter which does not relate to the subject matter of the testimony of the witness, the court shall order the United States to deliver such statement for the inspection of the court in camera. Upon such delivery the court shall excise the portions of such statement which do not relate to the subject matter of the testimony of the witness. With such material excised, the court shall then direct delivery of such statement to the defendant for his use. If, pursuant to such procedure, any portion of such statement is withheld from the defendant and the

lowed this precise procedure in the instant case.

The Jencks Act is so named because the Supreme Court opinion in *Jencks v. United States,* 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103 (1957), decided on June 3, 1957, quickly led to the enactment of 18 U.S.C. § 3500 on September 2, 1957 (71 Stat. 595). The statute was intended to restrict the indiscriminate production to defendants of summaries prepared by FBI agents after interviews with potential witnesses. Interpreting the new statute, Justice Frankfurter wrote:

> Not only was it strongly feared that disclosure of memoranda containing the investigative agent's interpretations and impressions might reveal the inner workings of the investigative process and thereby injure the national interest, but it was felt to be grossly unfair to allow the defense to use statements to impeach a witness which could not fairly be said to be the witness' own rather than the product of the investigator's selections, interpretations and interpolations.

*Palermo v. United States,* 360 U.S. 343, 350, 79 S.Ct. 1217, 1223, 3 L.Ed.2d 1287 (1959). The underlying premise of this statement is that disclosure of complete statements of FBI agents is not required under the statute.

*Palermo* was followed by *Scales v. United States,* 367 U.S. 203, 81 S.Ct. 1469, 6 L.Ed.2d 782 (1961) wherein Justice Harlan, speaking for the Court, remarked:

> It is enough to say here that there can be no complaint by a criminal defendant that he has been denied the opportunity to examine statements by government witnesses *which do not relate to the subject matter of their testimony,* for such statements bear no greater relevance to that testimony which he seeks to impeach than would statements by persons unconnected with the prosecution.

367 U.S. at 258, 81 S.Ct. at 1501. (emphasis added). In line with these cases, we conclude that a "statement" within the definition of 18 U.S.C. § 3500(e) must be produced only if it does relate to the subject matter of the testimony of the witness. Just because a document is a "statement" under 18 U.S.C. § 3500(e) does not necessarily mean that it must be produced under the Jencks Act if its contents do not relate to the testimony of the witness who made the statement. Similarly, if only a portion is relevant, it is not required that the entire statement be produced. See *e. g. Brinlee v. United States,* 496 F.2d 351, 354 (8th Cir. 1974); *United States v. Estrada,* 441 F.2d 873, 879–80 (9th Cir. 1971); *United States v. Allsenberrie,* 424 F.2d 1209, 1215 (7th Cir. 1970); *Oertle v. United States,* 370 F.2d 719, 725 (10th Cir. 1966).

In this instance we have unsealed the FBI report in question, have read its complete contents, and have compared it with the relevant testimony of Agent Murphy (Mo. Tr. 40–61; Tr. 22–78). We agree with the trial judge that only pages 4 to 12 inclusive relate to Murphy's testimony. We accordingly affirm his ruling on this motion.

## IV

### The Motion to Sever

The indictment charged Mason with four offenses: (1) one count of interstate transportation of a stolen motor vehicle in violation of the Dyer Act, 18 U.S.C. § 2312, alleged to have occurred on November 23, 1973; (2) one count of unauthorized use of a motor vehicle, in viola-

---

defendant objects to such withholding, and the trial is continued to an adjudication of the guilt of the defendant, the entire text of such statement shall be preserved by the United States and, in the event the defendant appeals, shall be made available to the appellate court for the purpose of determining the correctness of the ruling of the trial judge. Whenever any statement is delivered to a defendant pursuant to this section, the court in its discretion, upon application of said defendant, may recess proceedings in the trial for such time as it may determine to be reasonably required for the examination of such statement by said defendant and his preparation for its use in the trial.

tion of D.C. Code § 22–2204, alleged to have occurred on March 4, 1974; and two counts charging federal firearms offenses in violation of (3) 26 U.S.C. § 5861(a) and (4) 26 U.S.C. § 5861(i), also alleged to have been committed on March 4, 1974.

Appellant moved to sever the trial of the two vehicle offenses from the firearms offenses. The trial court was sympathetic to the motion insofar as the Dyer Act offense was concerned because it related to a date over three months prior to the date of the other offenses. As an alternative to the complete severance of the vehicle and firearms cases, the court suggested severance of the Dyer Act charge and joint trial of the three offenses alleged to have been committed on March 4, 1974. The voluntary reply of appellant's counsel to this suggestion was, ". . . I think that would be a good suggestion, also." (Tr. 3) [14] Following this affirmative response to his alternative suggestion, the court severed the trial of the Dyer Act offense (Tr. 5). This charge was ultimately dismissed following Mason's conviction on the three counts which are the subject of this appeal.

▮ In view of the position taken by appellant on the trial court's suggestion, it is apparent that he voluntarily agreed to modify his severance motion to request only the severing of the Dyer Act offense and cannot now be heard to object to the joint trial of the offenses to which he consented. Furthermore, this was actually a very reasonable resolution of his motion because joinder of the March 4th offenses saved all parties an extra trial and the two types of offenses involved were so distinctly different and unconnected that confusion of the jury was highly unlikely.

For the foregoing reasons we affirm the convictions on all three counts.

*Affirmed.*

BAZELON, Chief Judge (concurring in part and dissenting in part):

I concur in the court's judgment affirming defendant's conviction for unauthorized use of a vehicle.[1] But I cannot join in affirming the firearms convictions, for I believe the weapon was seized in violation of the defendant's Fourth Amendment rights.

The court today concludes that the suitcase in which the rifle was found was "within [Mason's] immediate control, thereby justifying a protective search.[2] I am fully aware of the multiple hazards officers face in making arrests. Consequently, I am prepared to uphold any

---

14. MR. KOLKER: I would, for the record, renew the position I earlier made that it is impossible for this defendant to receive a fair trial if we join both pairs of counts. And, I therefore ask that Counts Two and Three be severed and tried separately from One and Four; or, if Your Honor's suggestion, Counts Two, Three, and Four, be tried together and Count One severed out, I think that would be a good suggestion, also.

(Tr. 3).

The government mildly opposed this suggestion but the court ruled:

I will sever the first count. We will go to trial on the second, third, and fourth count. (Tr. 5).

1. I concur in parts IIB and III of the court's opinion. I concur in only the result of part IV, for even if defense counsel's statement that severing only count one "would be a good suggestion" can be deemed a waiver of the motion to sever count four as the court contends,

173 U.S.App.D.C. at ——, 523 F.2d at 1130 *supra*, that waiver was retracted when, prior to resting his case, defense counsel renewed his motion. (Tr. Tran. at 182–83). I would hold instead that the district court did not abuse its discretion in denying the motion: the evidence was simple and distinct so that the danger of the jury cumulating it was minimal, *see, e. g., Baker v. United States*, 131 U.S.App.D.C. 7, 401 F.2d 958, 974 (1968); *Dunaway v. United States*, 92 U.S.App.D.C. 299, 205 F.2d 23, 26 (1953); and the defense failed to make a special showing as to why it would be confounded by a refusal to sever, *see, e. g., Bradley v. United States*, 140 U.S. App.D.C. 7, 433 F.2d 1113, 1122 (1969); *Blunt v. United States*, 131 U.S.App.D.C. 306, 404 F.2d 1283, 1289 (1968), *cert. denied*, 394 U.S. 909, 89 S.Ct. 1021, 22 L.Ed.2d 221 (1969).

2. 173 U.S.App.D.C. at ————, 523 F.2d at 1125–1126 *supra*.

search reasonably necessary to protect officers. But the court's conclusion that the rifle in this case endangered the agents defies belief. At the time of the search the defendant's hands were handcuffed in front of him, an armed FBI agent was holding him, and a second armed agent stood between the defendant and the suitcase.[3] The suitcase sat on a closet shelf at eye level, three to four feet away.[4] Perhaps if Mason had "been possessed of the skill of Houdini and the strength of Hercules,"[5] the court's conclusion might be justifiable. But the court offers no evidence to "place him in such legendary company,"[6] nor does it explain how the mere "possibility of legerdemain"[7] can justify a warrantless search.

The court's finding that the suitcase was within the defendant's reach is all the more remarkable in light of arresting agent Murphy's testimony. The court states that Murphy "would have been derelict in his duty to protect the other agent and himself if he had not taken the necessary precaution to examine the suitcase. . . ."[8] But Murphy disavowed any intent to "examine the suitcase"; he sought only to push it

away.[9] Moreover, the reason he offered for moving it was *not* that it was within the defendant's control. Rather, Murphy testified that he intended to unhandcuff Mason and permit him to select a jacket from the closet, and that the suitcase was moved because it would have come under Mason's control if he were unhandcuffed.[10] Even the government does not attempt to argue that the suitcase was within Mason's control. Thus, the court rests its decision on a theory not deemed credible by either the arresting agent or the government.

Nothing in *Chimel v. California*[11] supports the court's decision.[12] Although *Chimel* involved a search of a three bedroom house, *Chimel's* holding is not limited to prohibiting such massive searches. Instead, the Court expressly overruled *United States v. Rabinowitz*,[13] which had involved the search of a single room, and held that searches incident to arrest must be confined to the area "within [a defendant's] reach."[14] To uphold a search any broader, the Court concluded, would be to uphold every search, no matter how broad.[15] Admittedly, the area "within reach" cannot be defined with precision. But the cases following *Chi-*

3. Mo. Tr. at 51–54, 67.

4. *Id.* at 53–55.

5. *United States v. Frick*, 490 F.2d 666, 673 (5th Cir. 1973) (Goldberg, J., dissenting), *cert. denied*, 419 U.S. 831, 95 S.Ct. 55, 42 L.Ed.2d 57 (1974).

6. *Id.*

7. *Id.*

8. 173 U.S.App.D.C. at ——, 523 F.2d at 1126 *supra.*

9. Mo. Tr. at 56–58.

10. Murphy's grand jury testimony, reprinted in note 4 of the court's opinion, is clear on this point, as is both his first explanation (reprinted in the court's opinion at 3 *supra*) and last explanation (Mo. Tr. at 58–59) at the hearing on the motion to suppress. His testimony in the middle of his interrogation, *see id.* at 53, is less clear. Taken out of context, this latter testimony could support the court's conclusion.

11. 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969).

12. Of the other cases cited by the court, two are wholly inapposite. *United States v. Manarite*, 314 F.Supp. 607 (S.D.N.Y.1970), *aff'd*, 448 F.2d 583, 593 (2d Cir.), *cert. denied*, 404 U.S. 947, 92 S.Ct. 281, 30 L.Ed.2d 264 (1971) (evidence found in plain view when officer selects clothing for defendant); *United States v. Webster*, 426 F.2d 289 (4th Cir. 1970), *cert. denied*, 402 U.S. 986, 91 S.Ct. 1676, 29 L.Ed.2d 152 (1971) (pre-*Chimel* search). The third, *United States v. Williams*, 147 U.S.App.D.C. 173, 454 F.2d 1016, 1017 (1972) is a brief per curiam which does not set forth the relevant facts. From the record in *Williams*, it appears that the two defendants were both unhandcuffed and three feet from the weapons at the time of the search. Tr. at 68–70, *United States v. Williams, supra.*

13. 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653 (1950).

14. 395 U.S. at 766, 89 S.Ct. 2034.

15. *Id.*

*mel* establish that once a defendant is handcuffed, the area within reach must be narrowly defined.[16] By ignoring these cases, this court adheres to the form but not the substance of *Chimel.* Its holding would seem to provide "search incident to arrest" with a magic power to justify any search.

The government's theory for upholding the search is equally untenable. The government argues that moving the suitcase was a reasonable precaution before unhandcuffing Mason and allowing him access to the closet. But the assumption that the agents actually intended to allow Mason to remove a jacket from the closet is quite incredible. Although Agent Murphy claimed to have told Mason that Mason would be permitted to go to the closet, Agent Bailey testified that both he and Murphy had told Mason they would get the jacket for him.[17] Murphy never explained how moving one

suitcase within the closet could possibly make it safe to give Mason unsecured access, especially since the closet contained clothing "all pressed together" which was never searched.[18] Most important, there was no need whatsoever to unhandcuff Mason and let him go to the closet. He had already described in detail the jacket he wanted.[19] The only credible thing for the agents to have done is what they eventually did: remove the jacket for him.[20]

Of course, it is not our role to resolve factual questions. Unfortunately, however, the trial judge failed to make findings or offer reasons for denying the motion to suppress. Thus we cannot know whether he credited Murphy's testimony that Murphy was planning to allow Mason unsecured access to the closet. At the very least, I would require an explicit finding before I could assume that the trial judge so found.[21]

---

**16.** *See United States v. Mapp,* 476 F.2d 67, 80 (2d Cir. 1973); *United States v. Shye,* 473 F.2d 1061, 1066 (6th Cir. 1973) (area four feet from one suspect cannot be searched if suspect "under control"); *United States v. Baca,* 417 F.2d 103, 105 (10th Cir. 1969), *cert. denied,* 404 U.S. 979, 92 S.Ct. 347, 30 L.Ed.2d 294 (1971); *cf. United States v. Weaklem,* 517 F.2d 70 (9th Cir. 1975) (greater search permissible before defendant handcuffed); *United States v. Patterson,* 447 F.2d 424 (10th Cir. 1971), *cert. denied,* 404 U.S. 1064, 92 S.Ct. 748, 30 L.Ed.2d 752 (1972) (same).

**17.** Mo. Tr. at 65, 67.

**18.** *Id.* at 59.

**19.** *Id.* at 51.

**20.** *Id.* at 50, 57, 65. This is also the procedure that has been followed in other reported cases involving a similar fact situation. *See, e. g., United States v. Wysocki,* 457 F.2d 1155 (5th Cir.), *cert. denied,* 409 U.S. 859, 93 S.Ct. 145, 34 L.Ed.2d 105 (1972); *United States v. Manarite, supra* note 12; *United States v. Titus,* 445 F.2d 577 (2d Cir.), *cert. denied,* 404 U.S. 957, 92 S.Ct. 323, 30 L.Ed.2d 274 (1971); *United States ex rel. Falconer v. Pate,* 319 F.Supp. 206 (N.D.Ill.1970), *aff'd,* 478 F.2d 1405 (7th Cir.), *cert. denied,* 414 U.S. 1094, 94 S.Ct. 726, 38 L.Ed.2d 551 (1973). Indeed this court has recently affirmed a case in which the same FBI agent handed clothes to an unclad, hand-

cuffed defendant. *See* Mo. Tr. at 10, 28, *United States v. Shields,* Crim. No. 74–486, *aff'd mem.,* 515 F.2d 1019 (1975).

**21.** We have held that when a trial court fails to make findings of fact on a motion to suppress, its ruling will be upheld if supported by "any reasonable view of the evidence." *Scarbeck v. United States,* 115 U.S.App.D.C. 135, 317 F.2d 546, 562 (1962), *cert. denied,* 374 U.S. 856, 83 S.Ct. 1897, 10 L.Ed.2d 1077 (1963); *see United States v. Lindsay,* 165 U.S.App.D.C. 105, 506 F.2d 166, 170 (1974). Those decisions need not bar remand for clarification of ambiguity as to whether a particular factual question was addressed by the trial court. *Cf. United States v. Smith,* 171 U.S.App.D.C. 342, 520 F.2d 74 (D.C.Cir. 1975); *Masiello v. United States,* 113 U.S.App.D.C. 32, 304 F.2d 399 (1962). *See also United States v. Miner,* 484 F.2d 1075, 1077 (9th Cir. 1973). If *Scarbeck* requires appellate courts to substitute speculation for findings, then it is contrary to sound principles of judicial administration. Findings and explanations are both essential for proper review and are an indispensable aspect of basic fairness. There is no justification for dispensing with findings, since requiring them "is not onerous if the matter was dealt with in a conscientious manner in passing on the merits." *Davis v. Clark,* 131 U.S.App.D.C. 379, 404 F.2d 1356, 1358 (1968) (separate opinion of Tamm, J.).

If the only defect in the government's argument were its assumption regarding the agents' intent, remanding the record for supplementation might well be appropriate. But even were the trial court to find that the agents planned to unhandcuff Mason, the government would still be required to justify that plan. A search cannot be upheld simply because the arresting officers decide to unhandcuff a defendant. For *Chimel* to have any meaning, police officers must be prohibited from freely enlarging the area under a defendant's control and thereby expanding the scope of their search.[22] Only a compelling justification can be accepted in defense of such conduct.[23]

In this case, no justification—compelling or otherwise—is offered for allowing Mason access to the closet.[24] Plainly, there was no need to do so. From all that appears on the record—and without any clarifying findings—the only rational inference is that the agents wanted an excuse for rummaging through the closet. Since the government wholly failed to meet its burden of justification, I would reverse the firearms convictions.[25]

22. *Cf., e. g., United States v. Smith, supra* note 21; *United States v. Masiello, supra* note 21. On remand it would be for the district judge to decide whether to hold further hearings.

23. The court acknowledges this principle, 173 U.S.App.D.C. at ——, 523 F.2d at 1125–1126 *supra*, but regards it as irrelevant because of its finding that the suitcase was within Mason's reach.

24. *See United States v. Marshall*, 499 F.2d 76 (5th Cir. 1974), *cert. denied*, 419 U.S. 1112, 95 S.Ct. 788, 42 L.Ed.2d 809 (1975) (search of car not within defendant's control justified by policy of permitting defendants to drive their cars to police station); *Parker v. Swenson*, 332 F.Supp. 1225 (E.D.Mo.1971), *aff'd*, 459 F.2d 164 (8th Cir. 1972), *cert. denied*, 409 U.S. 1126, 93 S.Ct. 943, 35 L.Ed.2d 258 (1973) (expanded search justified by defendant's request to go to his locker).

The requirement that unnecessary searches be avoided is simply a specific embodiment of the requirement that when constitutional rights are at stake, the least drastic means must be chosen to accomplish governmental objectives. *See, e.g., United States v. Robel*, 389 U.S. 258, 88 S.Ct. 419, 19 L.Ed.2d 508 (1967); *Shelton v. Tucker*, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960). That principle has been adopted in a number of fourth amendment contexts. For example, airport searches have been held unlawful if a would-be-passenger elects not to board the plane. *See United States v. Miner*, 484 F.2d 1075 (9th Cir. 1973); *cf. United States v. Albarado*, 495 F.2d 799, 807 (2d Cir. 1974); *United States v. Davis*, 482 F.2d 893, 910–11 (9th Cir. 1973). *See also Wyman v. James*, 400 U.S. 309, 317–18, 91 S.Ct. 381, 27 L.Ed.2d 408 (1971) (upholding welfare home visits because, *inter alia*, recipient has right to refuse entrance); *United States v. Williams*, 372 F.Supp. 65, 67–68 (D.S.D.1974). Similarly, the scope of searches have been limited based on the justification for the search. *Compare Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), *with United States v. Robinson*, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973).

25. In the guise of criticizing my discussion of the Government's theory, the majority offers yet a third explanation for the search; according to this version, the search was conducted so that Mason could be unhandcuffed while putting on the jacket. *See* n.10 *supra.* This explanation is wholly inconsistent with the theory offered in the text of the majority opinion, 173 U.S.App.D.C. —— ——, 523 F.2d 1125–1127, *supra*, and finds no support in the agents' testimony, *see* Mo. Tr. at 51, 59. *See also* Government Brief at 14–15. It does not explain how moving one suitcase could have assured the agents' safety, *see* text at note 18 *supra.* And it cannot justify the search, since no reason is offered for permitting Mason to put on the jacket while standing so close to the closet. Indeed, all that the majority's theory proves is the vital need for requiring findings from the district court, rather than basing our decision on surmise. *See* text & note 21 *supra.*