Calvin **MOORE**, Jr., Appellant,

v.

**UNITED STATES**, Appellee.

Christopher **JOHNSON**, Appellant,

v.

**UNITED STATES**, Appellee.

Nos. 8069, 8080.

District of Columbia Court of Appeals.

Argued Nov. 20, 1974.

Decided Feb. 3, 1976.

D. C., appointed by the court, for appellant Moore, adopted brief in No. 8080.

Nicholas Gilman, Asst. U. S. Atty., Washington, D. C., with whom Earl J. Silbert, U. S. Atty., John A. Terry and John P. Hume, Asst. U. S. Attys., Washington, D. C., were on the brief, for appellee.

Before KELLY, FICKLING and HARRIS, Associate Judges.

KELLY, Associate Judge:

Appellant Moore was convicted by a jury of armed robbery, D.C.Code 1973, §§ 22–2901, –3202, and was sentenced to three to ten years imprisonment. Appellant Johnson was convicted of robbery, D.C. Code 1973, § 22–2901, for which he was imprisoned for eighteen months to ten years. The victim of the robbery, James E. Gibbs, identified appellants seventeen days after the event in a chance street encounter near the courthouse. This identification was the only evidence linking appellants with the offense. No proceeds of the robbery were recovered, no usable fingerprints were taken from Gibbs' car which appellant Johnson had attempted to start during the robbery, and no other evidence of appellants' participation in the crime was presented. The issue on appeal is whether the trial judge erred in refusing to impose the sanctions of the Jencks Act, 18 U.S.C. § 3500 (1970), by striking Gibbs' testimony when the government failed, upon request, to produce a police officer's notes which were taken in an interview immediately following the robbery and contained the witness' initial description of the robbers.[1]

■ Complainant Gibbs testified at trial that there were two robbers; that the gunman was "on the same plane" with him,

Frederick H. Weisberg, Washington, D. C., appointed by the court, for appellant Johnson. James E. Mundy, Washington,

---

1. 18 U.S.C. § 3500(b) (1970), provides:

After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified. If the entire contents of any such statement relate to the subject matter of the testimony of the witness, the court shall order it to be delivered directly to the defendant for his examination and use.

which was about five feet nine inches in height, and that his companion only came up to the gunman's shoulder. Officer James D. Nance, who took the report of the robbery, testified that he had written down Gibbs' description of the robbers;[2] that his notes had been misplaced, and that Gibbs had told him, among other things, that both robbers were five feet five inches tall.[3] After Officer Nance completed his direct testimony, defense counsel requested the production of the notes containing the witness' description of the robbers. The government failed to produce the notes and counsel moved to strike the complainant's testimony. The court summarily held that the notes were not Jencks material, but when reminded of this court's decision in *Banks v. United States*, D.C. App., 305 A.2d 256 (1973), and of the Police Department Regulations requiring the preservation of descriptive notes taken at the scene, a brief inquiry was made of the officer which developed that the notes could not be found. The court nevertheless denied the motion to strike without indicating whether the ruling was that the notes were not Jencks material or that the government's inability to produce the witness' statement due to its loss did not require the imposition of sanctions under the Act. Because the basis of the court's ruling is uncertain we remand the record for a full hearing on the question.

For the Jencks Act to apply and for the right of discovery to exist under the Act, the records at issue must be "statements" within the meaning of the Act.[4] And when the statement of a witness is oral, a transcription of the statement must be "substantially verbatim" and "recorded contemporaneously". The transcription must be a continuous, narrative recording rather than mere selective notations or excerpts from the oral statements.[5] Documents which substantially incorporate notes or records of oral statements of a witness may satisfy the production requirements of the Act depending on the reliability of the reporting process and the absence of prejudice to the defendant.[6]

The District of Columbia Police Department promulgated General Order Series 601, No. 2, effective May 26, 1972, amended September 1, 1972, which requires the preservation of statements of prospective witnesses and specifically states that "this includes an officer's rough notes of the description of the perpetrator of a crime given by the victim or witness prior to the arrest of a suspect."[7] The materials are to

---

2. Gibbs described Moore, of whom he had a good view for some minutes, as having a light brown complexion, being about his height (5'9"), wearing a bush haircut and having sharp features. Johnson, whom he saw only in profile, had a large bush haircut and his appearance and mannerisms reminded Gibbs of a mouse. As they departed the scene, Moore walked with long strides, with his hands in his pockets and his shoulders hunched. Johnson alternatively walked and ran with a hopping movement in order to keep up with Moore. These same movements attracted Gibbs' attention when he saw appellants several weeks later.

3. Gibbs at first denied making such a statement to the officer, but later said he might have done so but could not really remember.

4. 18 U.S.C. § 3500(e) (1970), provides:
 The term "statement", as used in subsections (b), (c), and (d) of this section in relation to any witness called by the United States, means—

(1) a written statement made by said witness and signed or otherwise adopted or approved by him;
(2) a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously with the making of such oral statement; or
(3) a statement, however taken or recorded, or a transcription thereof, if any, made by said witness to a grand jury.

5. *Palermo v. United States*, 360 U.S. 343, 351–52, 79 S.Ct. 1217, 3 L.Ed.2d 1287 (1959).

6. *Banks v. United States*, supra at 258–59; *United States v. Bundy*, 153 U.S.App.D.C. 191, 194, 472 F.2d 1266, 1269 (1972) (Leventhal, J., concurring).

7. Three prior cases in this court have stressed the need to comply with this order. *Hardy v. United States*, D.C.App., 316 A.2d 867, 871 (1974) (Gallagher, J., concurring); *Savage*

be maintained in investigative case jackets and kept in secure file cabinets until the case to which they relate has been disposed of or for a three-year period if no criminal proceedings are initiated. Thus the government has, on the record in this case, met its obligation of setting up proper procedures for preservation of discoverable material.[8] But Officer Nance did not comply with the prescribed procedure. He testified that although he could not remember what happened to the notes, it was his practice to put such material in his locker and that when he looked for the notes for the trial, he was unable to find them. Thus, the officer's actions with regard to the preservation of the notes were negligent.

Before deciding whether sanctions should have been imposed, however, it is necessary to know whether the notes were Jencks Act statements and whether the substance of the notes was incorporated in other documents. Police notes in a particular case have been regarded as potentially Jencks Act statements. *Hardy v. United States*, D.C.App., 316 A.2d 867, 870 & n. 3 (1974). In other cases these notes have been thought to fall outside the Jencks Act because they are "rough",[9] "general", "sketchy", and/or "hasty",[10] and thus not verbatim statements of the witness. In a recent case eyewitness' descriptions included in a lost court-work jacket were characterized in dictum as falling in this category when the court stated:

> *v. United States*, D.C.App., 313 A.2d 880, 883–84 (1974) ; *Banks v. United States, supra* at 259.

[I]t has been held that rough, investigative notes taken by police officers at the scene of a crime are not "substantially verbatim" statements within the coverage of the Jencks Act. *United States v. Scriber*, 163 U.S.App.D.C. 36, 43, 499 F.2d 1041, 1048 (1974).[11]

■ The production of on-the-scene notes is in keeping with the purpose of the Act, to aid the search for truth by facilitating impeachment of the government's witnesses.[12] There is no doubt that the notes in question here related to a crucial issue and that they might have served to discredit the testimony of the complaining witness. As in *United States v. Bundy*, 153 U.S.App.D.C. 191, 193, 472 F.2d 1266, 1268 (1972) (Leventhal, J., concurring), the notes might have permitted the defense to undercut subsequent identifications of appellants by showing that their actual appearances differed from the complainant's initial description. As the court there stated, "[t]he initial description of an assailant by the victim or other eyewitness is crucial evidence, and the notes taken of that description should be kept and produced." *Id.* at 192, 472 F.2d at 1267.

■ Even where the statements are Jencks material, however, the rule of production under the Act is subject to an exception if the substance of the notes was incorporated in other documents. Officer Nance testified that everything he had written down was broadcast on the original

8. *United States v. Bryant*, 142 U.S.App.D.C. 132, 439 F.2d 642, *aff'd on remand*, 145 U.S.App.D.C. 259, 448 F.2d 1182 (1971).

9. *United States v. Augenblick*, 393 U.S. 348, 354, 89 S.Ct. 528, 21 L.Ed.2d 537 (1969).

10. *United States v. Hines*, 147 U.S.App.D.C. 249, 263–64, 455 F.2d 1317, 1331–32 (Bazelon, J., concurring and dissenting, *cert. denied*, 406 U.S. 969, 975, 92 S.Ct. 2427, 32 L.Ed.2d 669, 675 (1972).

11. Compare the dissenting view of Judge Bazelon in *United States v. Hines, supra* note 10, 147 U.S.App.D.C. at 268, 455 F.2d at 1336: "[I]t would seem only reasonable that specific words of description would be written down in the course of even the roughest note-taking" and would thus constitute Jencks Act material.

12. *Hardy v. United States, supra* at 869; *United States v. Bryant, supra*, 142 U.S.App.D.C. at 138, 439 F.2d at 648.

flash lookout. A transcript of the lookout was available, but was not produced.[13] The burden of producing notes or explaining why this cannot be done is on the government, *United States v. Augenblick,* 393 U.S. 348, 355–56, 89 S.Ct. 528, 21 L.Ed.2d 537 (1969), and if the government wishes to meet its burden, it must come forward with an explanation, or, here, with material to bring it within the exception. Since it has not done so, the record is remanded for a hearing to determine whether Officer Nance's notes constitute a statement producible under the Jencks Act and the correspondence of the lookout to the information transcribed by Officer Nance.

*So ordered.*

HARRIS, Associate Judge (dissenting):

The majority's elevation of the missing rough notes to a level which warrants remand is, in my opinion, contrary to both law and reason. Further, when the few relevant facts of record are analyzed, the remand order is seen to present a rather striking example of an exercise in futility. Accordingly, although the majority opinion appears somewhat innocuous, I respectfully dissent. Because of the importance of the underlying issue presented, I do so in some detail.

I

I begin by recognizing the fundamental principle that the unifying objective of our adjudicatory system is the determination of truth. *See, e.g., Gregory v. United States,* 125 U.S.App.D.C. 140, 143, 369 F.2d 185, 188 (1966). The majority correctly observes that the Jencks Act seeks to serve this objective "by facilitating [the] impeachment of the government's witnesses." (At 19). However, in their willingness to apply the provisions of that statute to the rough investigatory notes of a police officer, *my colleagues minimize the govern-*

ment's evidence against appellants—perhaps to justify their apparent concern as to the missing piece of paper. Emphasis is placed upon a lack of fingerprints and the failure to recover the proceeds of the crime. The jury, however, obviously found the identification testimony of the complaining witness to be wholly convincing. I agree, and conclude that such evidence is more than adequate to sustain the convictions. Since the majority apparently is willing to sacrifice the whole of the victim's testimony as the price to be paid for the officer's inadvertence, I believe it is appropriate to set out the facts which formed the basis of the identifications, and thus of the jury's determinations of guilt.

One night at 11:15 p. m., the complaining witness parked his car on a well-lighted street on his way to work on the night shift at the Government Printing Office. Two men approached him as he parked his car. Sensing trouble, he hastened to get out of his car. He had reached the area of his left front wheel when one of the two men pointed a gun at him, cocked the hammer, and said: "All right, buddy, you can hold it right there." The assailant demanded the car keys, and tossed them to his companion. The companion got into the car, and for several minutes sought unsuccessfully to start the car. (There were a large number of keys on the victim's key ring.) During that time, the man with the gun was in clear view of the victim. The assailant took the victim's wallet, containing over $90. The gunman repeatedly looked up and down the street, and finally called to his companion to get out of the car. The two assailants then left; the victim watched them closely as they retreated from the scene.

The gunman was about the victim's height; his companion was shorter. As the two departed, the complainant noticed that the pair walked with peculiar mannerisms. The taller man took long strides,

---

13. The officer also transferred information given to him by complainant onto a PD Form 251. That form is not of record but it should also be investigated at the hearing on remand.

with his hands in his pockets and his shoulders hunched forward. The shorter man moved beside him, at times walking and at times breaking into a run, with a hopping movement, in his efforts to keep up with the taller man.

Within a few minutes, the victim encountered a police officer. They toured the area in a scout car, but were unable to find the two men. Several days later, the complainant reviewed scores of police photographs, but he did not recognize any as being those of the men who had robbed him.

Seventeen days after the crime, the victim was in the same area, preparing to go home from work. As he began to drive from his parking space, he saw two men coming towards him, walking with exactly those characteristics which were so clearly etched in his memory. As they came closer, he studied their faces and recognized them positively as the men who had robbed him. He followed them in his car, and watched them enter Building A of the Superior Court. He then went to the nearby police headquarters, and enlisted the aid of Robbery Squad detectives. The two men were identified once again by the complainant as they later left the courthouse. They were arrested, and now are before us as appellants.

## II

There is, of course, no mystery as to the intent or meaning of what we refer to as the Jencks Act, 18 U.S.C. § 3500 (1970). It was enacted by Congress in 1957 as a prompt reaction to the Supreme Court's opinion in *Jencks v. United States,* 353 U. S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103 (1957). As stated by the Supreme Court in *Palermo v. United States,* 360 U.S. 343, 354, 79 S.Ct. 1217, 1226, 3 L.Ed.2d 1287 (1959):

The Act's major concern is with limiting and regulating defense access to government papers, and it is designed to deny

such access to those statements which do not satisfy [its] requirements.

*See United States v. Malcolm,* D.C.App., 331 A.2d 329, 333–34 (1975); *United States v. Mason,* D.C.Cir., 523 F.2d 1122, 1129 (1975).

The statute has certain characteristics which are unambiguous. First, it provides that no statement of a government witness is discoverable until the witness has testified. 18 U.S.C. § 3500(a) (1970). Second, it speaks specifically of a "statement or report *in the possession* of the United States which was made by a Government witness . . . ." *Ibid.* (emphasis added). Third, if the government should so request (*e.g.,* for reasons of security), the trial court shall inspect the document in question in camera to determine whether part or all of it is producible to the defense. 18 U.S.C. § 3500(c). Fourth, if the court directs production of a statement which has been examined and found producible, and the government chooses not to comply with such an order, "the court shall strike from the record the testimony of the witness, and the trial shall proceed unless the court in its discretion shall determine that the interests of justice require that a mistrial be declared." 18 U.S.C. § 3500(d). Fifth, the statute narrowly defines the term "statement". Subsection (e) provides:

The term "statement", as used in . . . this section in relation to any witness called by the United States, means—

(1) a written statement made by said witness and signed or otherwise adopted or approved by him;

(2) a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously with the making of such oral statement; or

(3) a statement, however taken or recorded, or a transcription thereof, if any, made by said witness to a grand jury.

I acknowledge that it is theoretically conceivable that the rough notes of a police officer, taken at the scene of a crime, might reach the level of constituting a "statement" as defined in § 3500(e). It must be recognized, however, that the elevation of an officer's rough notes to such a degree of significance would depend upon a combination of circumstances which rarely—if ever—would occur in real life. In the first case in which the Supreme Court interpreted the Act, *Palermo v. United States, supra,* the Court explained why such a restrictive definition of the term "statement" was adopted (360 U.S. at 352–53, 79 S.Ct. at 1224):

It is clear that Congress was concerned that only those statements which could properly be called the witness' own words should be made available to the defense for purposes of impeachment. It was important that the statement could fairly be deemed to reflect fully and without distortion what had been said to the government agent. Distortion can be a product of selectivity as well as the conscious or inadvertent infusion of the recorder's opinions or impressions. It is clear from the continuous congressional emphasis on "substantially verbatim recital," and "continuous, narrative statements made by the witness recorded verbatim, or nearly so . . . ," . . . that *the legislation was designed to eliminate the danger of distortion and misrepresentation inherent in a report which merely selects portions, albeit accurately, from a lengthy oral recital.* Quoting out of context is one of the most frequent and powerful modes of misquotation. We think it consistent with this legislative history, and with the generally restrictive terms of the statutory provision, to require that summaries of an oral statement which evidence substantial selection of material, or which were prepared after the interview without the aid of complete notes, and hence rest on the memory of the agent, are not to be produced. Neither, of course, are statements which contain the agent's interpretations or impressions. [Footnotes omitted; emphasis added.]

Four years later, the Supreme Court decided *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The case came from the Court of Appeals of Maryland, and hence had nothing to do with the Jencks Act. Two men were charged with murder, but they were tried separately. Prior to Brady's trial, his counsel asked the prosecutor for certain extrajudicial statements which had been made by Brady's companion in crime. In one of them, the companion confessed that while the two men had acted together, it was he, not Brady, who had done the actual killing. That particular statement was withheld by the prosecutor. The Court of Appeals held that to have been a deprivation of due process, and remanded the case for a retrial on the question of punishment (but not on the issue of guilt).

The Supreme Court affirmed. The Court stated in part (*Id.* at 87, 83 S.Ct. at 1196):

We now hold that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.

Although I recognize the continued validity of *Brady* and the constructiveness of its general principle, I share the reservations expressed by Mr. Justice White (in a separate opinion at 91–92, 83 S.Ct. 1194) and Mr. Justice Harlan (in dissent, joined by Mr. Justice Black, at 92 n. 1, 83 S.Ct. 1194) concerning the necessity and propriety of resolving the narrow issue presented in *Brady* on the elevated plane of due process analysis.

It remained for the United States Court of Appeals for the District of Columbia Circuit to seek to force a homogenization of the two concepts—the Jencks Act and *Brady*—which analytically are not subject to valid intermixture. That occurred in *United States v. Bryant,* 142 U.S.App.D.C. 132, 439 F.2d 642 (1971), which was issued two days prior to the effective date of court reorganization (February 1, 1971) in the District of Columbia. *Cf. M.A.P. v. Ryan,* D.C.App., 285 A.2d 310 (1971). *Bryant* dealt with a tape recording of conversations between defendants in a narcotics case and an undercover officer. The *Bryant* court speculated (probably correctly, perhaps not) that "the conversations recorded on the tape were absolutely crucial to the question of appellants' guilt or innocence." *Id.,* 142 U.S.App.D.C. at 138, 439 F.2d at 648. Defense efforts at pretrial discovery of the tape were fruitless, it having been lost. The court acknowledged (*id.* at 140, 439 F.2d at 650):

> To decide these cases, however, we need not conclude that the tape of Agent Pope's motel room conversations with appellants . . . fell within the scope of the Jencks Act disclosure requirement—as well as within the overlapping disclosure requirements of the due process clause and of [Fed.R.Crim. P.] Rules 16. Since the latter apply at the pretrial stage, the Jencks Act issue would not have been reached if the tape had been available and disclosed at that time.

Then came the attempted homogenization to which I have referred (*id.* at 140–41, 439 F.2d at 650–51):

> Technically, it may be that evidence which cannot be found is not in the Government's "possession." And, of course, that which the Government does not have it cannot disclose. But this line of reasoning is far too facile, and clearly self-defeating. The language of *Brady,* Rule 16 and the Jencks Act includes no reference to the timing of possession and

suppression. * * * Hence we hold that before a request for discovery has been made, the duty of disclosure is operative as a duty of preservation. Only if evidence is carefully preserved during the early stages of investigation will disclosure be possible later.

Following a discussion of *United States v. Augenblick,* 393 U.S. 348, 89 S.Ct. 528, 21 L.Ed.2d 537 (1969), in which the Supreme Court held that the loss of both rough notes and tape recordings of interviews with government witnesses did not constitute a denial of due process, the *Bryant* court stated (142 U.S.App.D.C. at 142, 439 F.2d at 652):

> Accordingly, we hold that sanctions for nondisclosure based on loss of evidence will be invoked in the future unless the Government can show that it has promulgated, enforced and attempted in good faith to follow rigorous and systematic procedures designed to preserve *all* discoverable evidence gathered in the course of a criminal investigation. [Footnote omitted.]

While the court labeled that statement as a "holding", clearly it was not. It was pure dicta, which was exclusively advisory and prospective in its applicability. Further, as discussed *infra,* it constituted basically an unwarranted effort by the court to exercise a form of supervisory authority over law enforcement agencies.

Since the issuance of *Bryant,* the pendulum which it put in motion has swung back and forth in the circuit court. In *United States v. Perry,* 153 U.S.App.D.C. 89, 471 F.2d 1057 (1972), the court dealt with the loss of a witness' grand jury testimony, which was a Jencks Act statement pursuant to 18 U.S.C. § 3500(e)(3). The court rejected an automatic striking of the witness' trial testimony because of the lost grand jury testimony, saying in part (*id.* at 95, 471 F.2d at 1063):

> Viewed in its proper perspective, the judicial process *is* a search for truth, not

an adversary game, and therefore the Jencks Act is not a mandate compelling the trial judge to strike . . . a witness' testimony when a previously made statement, irrespective of the reason, cannot be produced by the Government. On the other hand, the Government does not necessarily exonerate itself from the penalty of the statute by pleading so-called "good faith." Instead, the trial judge's effort must be to see that the defendant has access to previous statements of a witness to the fullest extent possible under the terms of the statute, in order to further the interests of justice in the search for truth. Whether the testimony of a witness is stricken . . . , however, is in the discretion of the trial judge if eliminating the witness' testimony would restrict the search for truth rather than assist it in the instant and future cases.

The *Perry* court further stated (*id.* at 99, 471 F.2d at 1067): "In order to exclude testimony, there should be a showing of either negligence or purposeful destruction accompanied by either bad motive or bad judgment." *See also United States v. Carpenter*, 166 U.S.App.D.C. 358, 510 F.2d 738 (1975) (affirming a conviction in a case in which a preliminary hearing transcript was lost).

The first case in which the circuit court dealt with police officers' loss of their on-the-scene investigative notes was *United States v. Hines*, 147 U.S.App.D.C. 249, 455 F.2d 1317 (1971), *cert. denied*, 406 U.S. 975, 92 S.Ct. 2427, 32 L.Ed.2d 675 (1972). Although the rough originals were not available, the substance of the lost notes had been incorporated in the appropriate police report forms, which were given to the defense. While the case involved events which had occurred prior to the *Bryant* decision, the circuit court rejected the appellants' arguments that the lost notes were producible, in theory, under the Jencks Act. The court stated (*id.* at 264, 455 F.2d at 1332):

The Supreme Court has held that, when the evidence introduced indicates that destroyed notes taken by investigating officials were informal or "rough," they cannot be considered "substantially verbatim" statements within the meaning of the Act. *See United States v. Augenblick*, 393 U.S. 348, 354–55, 89 S.Ct. 528, 21 L.Ed.2d 537 . . . (1969). [Footnote omitted.]

To the same effect is *United States v. Scriber*, 163 U.S.App.D.C. 36, 43, 499 F.2d 1041, 1048 (1974), in which the court stated that "it has been held that rough, investigative notes taken by police officers at the scene of a crime are not 'substantially verbatim' statements within the coverage of the Jencks Act." [Footnote omitted.]

The potential conflict between the expansive dicta of *Bryant* and the more restrictive interpretations of a Jencks Act statement expressed in *Hines* and *Scriber* has manifested itself further in the circuit court's more recent opinions. Slightly over two months ago, in *United States v. Mason, supra*, one division of that court stated that the Jencks Act "was intended to restrict the indiscriminate production to defendants of summaries prepared by FBI agents after interviews with potential witnesses." 523 F.2d at 1129. Two weeks later, another division decided *United States v. Harrison*, D.C.Cir., 524 F.2d 421 (1975). In *Harrison*, while the convictions on appeal were affirmed, the court utilized the same type of prospective dicta as it had in *Bryant*. The court declared that the rough notes of FBI agents are potentially discoverable and henceforth must be preserved under pain of possible sanctions.

My concern now may be made specific. Unquestionably, appellate courts have a significant degree of inherent supervisory authority over the trial courts whose rulings they are obliged to review. However, they have no such supervisory authority over law enforcement agencies. I have no quarrel with the objective expressed in the

*Bryant* and *Harrison* dicta; the retention of potentially discoverable material obviously is desirable. What I quarrel with is the way in which *Bryant* and *Harrison* seek to enforce the preservation of rough notes, namely, by threatening to strike testimony if a note is lost. The extension of a Jencks Act sanction to an actual Jencks Act statement which no longer is in the government's possession would be a serious enough step (and one which no appellate court yet has taken); to apply such a sanction in the case of lost rough notes in reliance upon an amalgamation of the Jencks Act and *Brady* would be wholly unwarranted, for neither the Act nor *Brady* has anything to do with a lost piece of paper.[1]

It is, of course, true that an officer's rough notes might constitute *Brady* material—*i. e.*, might contain exculpatory information—to which a defendant would be entitled prior to trial. However, *Bryant* and *Harrison* fallaciously proceed on the unspoken assumption that lost rough notes must be presumed to be exculpatory, and hence their mere loss in and of itself should give rise to the sanction of striking a witness' testimony. There is no more justification for ascribing an exculpatory quality to lost notes than there would be for presuming that an eyewitness to a crime who dies before trial would have given testimony which would be exculpatory to a defendant. Indeed, reason should persuade us of the contrary, for rough notes almost invariably provide at least a partial basis for police or FBI report forms, which regularly are made available to the defense. Absent some degree of

1. While the voluminous case law in this area suffers from an unfortunate lack of clarity and uniformity, I have become convinced that the position taken by the circuit court in *Bryant* and *Harrison* is in sharp conflict with the law in the other federal circuits. No other court has simultaneously stretched the scope of the Jencks Act to embrace an investigating officer's rough notes while inflexibly calling for the severe penalty of striking testimony where there has been a failure to preserve such material. Of the eight circuits which have considered the problem, all have avoided the extreme approach of *Bryant* and *Harrison* through either a properly restrictive interpretation of the Jencks Act's concept of a "statement" (*i. e.*, that the Act's requirements are not applicable to such rough notes), or by concluding that the failure to produce the originals was not prejudicial to the accused. Cases taking the latter approach generally do so by concluding that it was sufficient for the facts contained in the rough notes to have been made available to the defense in the form of summaries or standard police report forms; that is, before the drastic sanctions of the Jencks Act are to be applied, the defendant must demonstrate that the failure to produce the originals prejudiced him in the manner which the limited provisions of the Act were intended to prevent, namely, an impairment of his ability to impeach the government's witnesses. *See, e. g.*, *United States v. Atkinson*, 513 F.2d 38, 41–42 (4th Cir. 1975); *United States v. Curry*, 512 F.2d 1299, 1306–07 (4th Cir.), *cert. denied*, 423 U.S. 832, 96 S.Ct. 55, 46 L.Ed.2d 50 (1975); *United States v. Hurst*, 510 F.2d 1035, 1036 (6th Cir. 1975); *United States v.*

*Prieto*, 505 F.2d 8 (5th Cir. 1974); *United States v. Polizzi*, 500 F.2d 856, 892–94 (9th Cir. 1974), *cert. denied*, 419 U.S. 1120, 95 S.Ct. 802, 42 L.Ed.2d 820 (1975); *United States v. Principe*, 499 F.2d 1135, 1139 (1st Cir. 1974); *United States v. Stephens*, 492 F.2d 1367, 1376–77 (6th Cir.), *cert. denied*, 419 U.S. 852 & 874, 95 S.Ct. 93, 42 L.Ed.2d 83 (1974); *United States v. Pacheco*, 489 F.2d 554, 565–66 (5th Cir. 1974), *cert. denied*, 421 U.S. 909, 95 S.Ct. 1558, 43 L.Ed.2d 774 (1975); *United States v. Cruz*, 478 F.2d 408, 412–13 (5th Cir.), *cert. denied*, 414 U.S. 910, 94 S.Ct. 259, 38 L.Ed.2d 148 (1973); *United States v. Terrell*, 474 F.2d 872, 877 (2d Cir. 1973); *United States v. Mechanic*, 454 F.2d 849, 857 (8th Cir. 1971), *cert. denied*, 406 U.S. 929, 92 S.Ct. 1765, 32 L.Ed.2d 131 (1972); *Wilke v. United States*, 422 F.2d 1298, 1299 (9th Cir. 1970); *United States v. Covello*, 410 F.2d 536, 545–46 (2d Cir.), *cert. denied*, 396 U.S. 879, 90 S.Ct. 150, 24 L.Ed.2d 136 (1969); *United States v. Missler*, 414 F.2d 1293, 1304–05 (4th Cir. 1969), *cert. denied*, 397 U.S. 913, 90 S.Ct. 912, 25 L.Ed.2d 93 (1970); *United States v. Hilbrich*, 341 F.2d 555, 557 (7th Cir.), *cert. denied*, 381 U.S. 941, 85 S.Ct. 1775, 14 L.Ed.2d 704 (1965). The fact that the United States Court of Appeals for the District of Columbia Circuit stands alone in its proposed treatment of the inadvertent loss or good faith destruction of a police officer's rough investigative notes is reflected by the division's candid cataloging in *Harrison* of case law with which it chooses not to agree. *See United States v. Harrison, supra*, 524 F.2d at 429–32 and accompanying footnotes.

proof, I am unwilling to find sinister implications in the loss of an officer's rough notes.

Until today, this court properly has been wary of the expansive dicta of *Bryant*. As a consequence, I believe our decisions on the subject have demonstrated a course which is both more consistent and more logical than that reflected by the circuit court's *Bryant* progeny. It is true that we have accorded *Bryant* some deference, and we have welcomed the promulgation of the police general order which calls in part for the preservation of "an officer's rough notes of the description of the perpetrator of a crime given by the victim or witness prior to the arrest of a suspect." However, we have not been, nor are we now, bound by *Bryant*, as its disputed mandate was dicta only. More particularly, we have not felt compelled to follow its literal command to the extreme length of imposing a sanction for the loss of rough investigatory notes.[2]

In *Banks v. United States*, D.C.App., 305 A.2d 256 (1973), we noted that *Bryant* dealt with a lost tape recording, rather than with rough notes, and stated (*id*. at 258):

> Therefore, assuming, without deciding, that *Bryant* may be controlling here because of its directive to establish procedures for preserving investigative notes, we find that the failure of Officer Shuler to preserve the 3x5 note card was harmless error.

In *Hardy v. United States*, D.C.App., 316 A.2d 867 (1974), we dealt with another lost note. We observed that the note was "at least potentially discoverable,"[3] and concluded (*id*. at 870–71):

> [T]he officer's conduct did not constitute negligence necessitating the imposi-

tion of any sanction at the appellate level, particularly since the description given by [the victim] was never utilized by the police for any purpose at all. * * * We are satisfied that any possible error was harmless.

In *Johnson v. United States*, D.C.App., 322 A.2d 590 (1974), a department store's special police officer prepared a PD Form 163 following an arrest. A Metropolitan Police Department officer then observed that the form contained no information as to the value of the items which had been stolen. A new form was prepared, and the original apparently was thrown away. Defense counsel argued that the loss of the original form should result in a striking of the arresting officer's testimony. The trial court disagreed. We affirmed, noting in part (*id*. at 591):

> The statutory language makes it clear that the Act applies only to documents within the possession of the United States. Nowhere does the record in this case indicate that the original draft was in the possession of the government at the time of the trial. It has been held that "[t]he producibility of a statement depends upon its being within the particularities of the statute [Jencks Act]." *Matthews v. United States*, 407 F.2d 1371, 1376 (5th Cir. 1969). [Footnote omitted.]

More recently, in *In re A.B.H.*, D.C. App., 343 A.2d 573, 575 (1975), citing *United States v. Augenblick, supra*, and *United States v. Hines, supra*, we stated:

> We find to be without merit appellant's contention that the trial court committed reversible error in refusing to strike the testimony of the complainant when the police officer was unable to produce his notes of an interview with

---

2. In *Jones v. United States*, D.C.App., 343 A.2d 346, 352 (1975), we stated our conclusion "that the circuit court never intended its directive in the *Bryant* case to constitute an inflexible rule of exclusion . . . ."

3. Our use of the term "discoverable" in *Hardy* was deliberate. There is a significant difference between pretrial "discoverability" under Super.Ct.Cr.R. 16 and the "producibility" of a statement under the Jencks Act after a witness has testified.

her. In our view, the notes did not constitute a "statement" within the purview of 18 U.S.C.A. § 3500(e)(1) or (2) and, therefore, no Jencks Act sanction was warranted. The notes, described as "rough" and "mostly illegible", were neither

(1) a written statement made by said witness and signed or otherwise adopted or approved by him; [nor]

(2) a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness to an agent of the Government and recorded contemporaneously with the making of such oral statement.

Finally, in *In re R.D.J.*, D.C.App., 348 A.2d 301 (1975), we rejected the contention that the Jencks Act required the production of a police officer's notes of a conversation with a complainant, pointing out: "There was no evidence that the officer has ever made detailed written notes of what complainant said on the telephone. . . ." *Id.* at 303.

Thus, this court logically has moved away from an acceptance of the *Bryant* dicta in cases in which a police officer's investigatory notes are lost prior to trial. There are, of course, sound reasons for the direction in which we so clearly have gone prior to the majority's decision in this case. In a jurisdiction which experiences tens of thousands of criminal cases every year, the loss of some rough notes is inevitable despite the best intentions and efforts. The duties of a police officer are demanding, often hectic, and too frequently dangerous. It is totally unrealistic to expect the infallible filing of a collection of rough notes by each officer at the conclusion of each duty shift.

More importantly, I see no valid basis for the creation of what amounts to a new exclusionary rule. Few—if any—legal concepts have stirred more spirited debate than the exclusionary principle which has been developed as a response to unconstitutional searches and seizures. This has been true from the rule's adoption with reference to the actions of federal officials in *Weeks v. United States,* 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914), through its application to state action in *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed. 2d 1081 (1961), and continuing to the present. *See, e.g.,* the various opinions in *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). Without now entering into that debate, it is manifest that the exclusionary rule is grounded on the Fourth Amendment to the United States Constitution. What *Bryant* and *Harrison* unquestionably have sought to do is to transplant an old (and most severe) remedy into new ground by crossing the inherently distinct doctrines of the Jencks Act and *Brady*. There is no justification for the creation of a new exclusionary rule, particularly with respect to what is in reality the rather insignificant problem of the loss of a police officer's rough notes. There certainly is no basis for such a rule in the Constitution; the Supreme Court has specifically held that Jencks Act questions are not of constitutional dimension. *United States v. Augenblick, supra,* 393 U.S. at 356, 89 S.Ct. 528. There is no basis for such a rule in the Jencks Act itself; the statutory definition of a "statement" manifestly is not satisfied by an officer's on-the-scene notes (based upon what is typically a hectic interview with a victim or other witness to a crime), and the Act's applicability is limited by its own terms to statements which are in the possession of the government.[4] Nor is there any basis for such a rule in *Brady v.*

---

4. Moreover, the Act's requirement that the statement relate to the witness' testimony, and the consequent mandate to the trial court to excise those portions which do not, are impossible to apply to nonexistent material. These provisions of the Act add further support to the conviction that it could not have been meant to encompass lost notes.

*Maryland, supra.* There is no justification for presuming a lost rough note to be exculpatory and concluding that the impossibility of its production constitutes a denial of a fair trial. Finally, the *Bryant* court's reliance on Fed.R.Crim.P. 16 as partial support for its attempted homogenization of the Jencks Act and *Brady* was misplaced. In *United States v. Nobles*, 422 U.S. 225, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975), the Supreme Court unanimously held that Rule 16 is applicable solely to the pretrial stages of a criminal proceeding, while by its own terms the Jencks Act does not come into play until after a witness has testified.[5]

We noted in *Jones v. United States, supra* note 2 at 352, that:

> Considering the fact that of the thousands of criminal prosecutions in the Superior Court since the promulgation of the Police Department General Order only a very small number involved loss of a police officer's notes, we are satisfied that the Metropolitan Police Department has made "earnest efforts" to preserve crucial material.

Nonetheless, obviously some such cases have arisen and inevitably others will follow. It strikes me as akin to a puppy's efforts to catch its tail for the courts continually to be involved in what necessarily is mere speculation as to the contents of lost non-"statements," and to consider seriously the striking of presumably truthful testimony as retribution for an officer's loss of his notes. After all, as the Supreme Court stated in *United States v. Nobles, supra,* 95 S.Ct. at 2166:

The dual aim of our criminal justice system is "that guilt shall not escape or innocence suffer," *Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935). To this end, we have placed our confidence in the adversary system, entrusting to it the primary responsibility for developing relevant facts on which a determination of guilt or innocence can be made.

As recently as *In re A.B.H., supra,* we impliedly completed our rejection of the analytically defective *Bryant* dicta. Today's case provides us with an opportunity to make that rejection unmistakably clear. I would hold the unique sanction of the Jencks Act inapplicable to an investigating officer's lost rough notes. For too long we have camouflaged our unwillingness to accept *Bryant* by the use of euphemisms, such as the conclusion that "any possible error was harmless" (*see, e.g., Hardy v. United States, supra* at 871). The time has come to rid ourselves of the albatross.

### III

The factual situation before us epitomizes the major inherent difficulty with the result contemplated by the *Bryant* dicta, for this is a case with only one witness—the victim of the armed robbery. If the lost notes should call for the imposition of a sanction here, the result would be nothing less than a total suppression of the government's evidence against appellants.[6] Such an outcome, I submit, would shock a reasonable conscience infinitely more than would the fact that an officer lost a slip of

---

5. In *Nobles,* the Supreme Court dealt with the question of government access to the statements of witnesses which were taken by defense investigators. The Court sustained the right of the prosecution to review such statements if they are used by defense counsel as the basis for impeaching government witnesses.

6. The judiciary should be expected not to lose sight of the realities of the world in which we live. If the disappearance of an officer's notes were to be permitted to create a bar to prosecution, then such notes inevitably would become a target for disappearance—through circumstances such as favoritism, corruption, or theft. Alternatively, if a police officer sees a guilty defendant go free merely because of a misplaced piece of paper, it requires little imagination to anticipate that the officer simply will refrain from taking notes in the future. Such a result would not contribute to either efficient law enforcement or justice.

paper. *Cf. Rochin v. California,* 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952).

I referred at the outset to my belief that the majority's result is an exercise in futility. This conclusion is borne out by the few relevant facts of record. The first government witness was the victim of the armed robbery. The second was Officer James Nance, who was flagged down by the victim a few minutes after the robbery. The officer was told simply that the two robbers were Negro males, and that one was wearing a Navy-type pea jacket while the other wore a long dark coat. He apparently made a note of those limited facts, and then broadcast a lookout for such subjects.[7] The officer testified that he then tried to get more detailed descriptions. He stated: "But on a height and weight we had a little difficulty in communicating. He couldn't give me definitely, and I—I, what I was wanting was numbers. * * * I kept asking him how tall were they and what was their weight, and eventually he said, 'Five-five.'"[8] The officer later prepared a PD Form 251, relying at least in part on his notes; in it he said that both of the robbers were five-five.[9] The officer's limited notes, which manifestly could not have constituted a "statement" as defined in the Jencks Act, later

were placed by him in his locker, but could not be found when the case went to trial.

That is substantially all there is as to this issue. The trial court stated: "I will hold, as a matter of law, that [the notes] don't constitute Jencks material." Our opinion in *United States v. Banks, supra,* then was argued to the court, and some further questioning and argument occurred on the Jencks Act question. Defense counsel ultimately moved "to strike the testimony of the witness," and the motion was denied.[10]

The majority opinion includes the following statement: "Because the basis of the court's ruling is uncertain we remand the record for a full hearing on the question." (At 18.) It concludes that further proceedings are necessary "to determine whether Officer Nance's notes constitute a statement producible under the Jencks Act and the correspondence of the lookout to the information transcribed by Officer Nance."[11] (At 20.) I fear those statements will leave the trial court as much at sea on remand as they do me now. Certainly the trial court is not required to give reasons for its evidentiary rulings. Irrespective of that fact, by no stretch of the imagination could the miss-

7. The majority's treatment of the radio run is puzzling. At trial, the Assistant United States Attorney stated: "For the record, anything that they broadcast is certainly transcribed and is part of the radio run. I will be happy to make it part of the record." Experienced defense counsel made no further request as to the radio run. The record contains no support for the majority's statement that the radio run "was not produced." (At 20.)

8. The complaining witness testified in part: "When [Officer Nance] started asking me about the weight and the age and the height, I told him I couldn't tell him that."

9. The majority's treatment of the Form 251 also is puzzling. They state (at 20, n. 13): "That form is not of record but it should also be investigated at the hearing on remand." At trial, defense counsel made it clear that they had the Form 251, and it was used as a basis for cross-examining both the

victim of the robbery and Officer Nance. I fail to see how it could be "investigated" on remand any more than it already has been.

10. The motion appears to have been directed to the testimony of Officer Nance, although it should have been directed at the testimony of the complaining witness. *See Hardy v. United States, supra,* at 869–70. I am confident the trial court considered it properly.

11. It is, of course, wholly artificial to direct a finding as to whether the notes are "producible", for they apparently do not now exist. Yet I agree with the Eighth Circuit that: "The function of the trial court under [the Jencks Act] is limited purely to the question of *producibility,* i. e., . . . is the document a 'statement' under the Act." *Lewis v. United States,* 340 F.2d 678, 682 (8th Cir. 1965). This highlights against the basic absurdity of using an exclusionary rule as an enforcement technique to keep police officers from losing their notes.

ing notes validly be considered to be a Jencks Act "statement". Nonetheless, the majority remands the case for a hearing which already has been held, on an issue which not only has been decided already, but which has been decided correctly.

In *United States v. Augenblick, supra* quoting from *Palermo v. United States, supra,* the Supreme Court stated (393 U.S. at 355, 89 S.Ct. at 533) :

> [T]he administration of the Jencks Act must be entrusted to the "good sense and experience" of the trial judges subject to "appropriately limited review of appellate courts."

I fear the majority tends to dash that fond hope.[12] If the trial court on remand inexplicably were to reverse its prior ruling and conclude that the loss of the rough notes somehow requires striking the complaining witness' testimony, and if this court inexplicably were to sustain such a result, I would hope that someone far wiser than I could be enlisted to explain to the victim of the armed robbery how the clear terms of the Jencks Act could be so bastardized as to prevent him from testifying to the truth as he knows it. Those whom a jury validly has found to be guilty should not go free merely because the constable has lost a piece of paper.[13]

In my opinion, the experienced and able trial judge ruled correctly after a careful consideration of the precise issue the majority wants to have considered once again on remand. I am convinced that the judgments of conviction should be affirmed, and so respectfully dissent.

---

12. The majority does acknowledge: "Even where the statements are Jencks material, however, the rule of production under the Act is subject to an exception if the substance of the notes was incorporated in other documents." (At 19.) The existing record clearly reflects not only that Officer Nance's notes could not be a "statement" of the victim, but also that their substance was incorporated in the radio run and the Form 251.

13. I find equally unacceptable the suggestion that the loss of a note might warrant giving a variation of the missing witness instruction. *Cf. Jones v. United States, supra* at 352. As I have indicated, there is no basis in reason for assuming that missing notes would be exculpatory, and there is every basis in reason for assuming they would not be—unless, of course, one is prepared to accept the notion that the government would knowingly prosecute innocent defendants.